UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ADVENTIST GLENOAKS          )
HOSPITAL, et al.,           )
                            )
        Plaintiffs,         )
                            )
     v.                     )        Case Number   1:06-CV-01206
                            )
MICHAEL O. LEAVITT,         )
Secretary, United States Department )
of Health and Human Services,    )
                            )
        Defendant.          )

## STATEMENT OF THE ISSUE

Did the Health Care Financing Administration, and its Fiscal Intermediary,

properly determine the Medicare "wage index" for Medicare participating hospitals

subject to the Chicago Metropolitan Statistical Area wage index for Federal Fiscal Year

(FFY) 1999?

## STATEMENT OF THE FACTS

The parties agree there are no material facts in dispute.

I.    Background.

Medicare is a federal health insurance program that pays for medical care for

people 65 years of age or older, certain younger disabled people, and people with end

stage renal disease.  42 U.S.C. § 1395ww *et seq*.  The Secretary of Health and Human

Services (the Secretary) is responsible for administering the program through the Health

Care Financing Administration (HCFA)[1] and its Fiscal Intermediaries (FIs).  The FI is

---

[1] In the Spring of 2001, the Health Care Financing Administration (HCFA) changed its
name to the Centers for Medicare and Medicaid Services (CMS).  Because the issue

generally a private insurance company contracted by HCFA to administer Medicare Part A (hospital inpatient) payment functions in a given area.

For acute care inpatient services, hospitals are paid on a Prospective Payment System ("PPS"). 42 U.S.C. § 1395ww(d). Under PPS, hospitals are generally paid a predetermined amount based on the discharge diagnosis of patients as determined by their category of illness treated or "Diagnostic Related Group." See generally, 42 U.S.C. § 1395ww. This diagnosis driven payment is fixed regardless of the hospital's actual cost of rendering services to a particular patient. Palisades General Hospital Inc. v. Leavitt, 426 F.3d 400, 401 (D.C. Cir. 2005); Centra Health, Inc. v. Shalala, 102 F.Supp.2d 654, 656 (W.D. Va, 2000).

When establishing PPS Congress recognized that fixed DRG payments would need to be adjusted to accommodate geographic variations in labor costs. Methodist Hospital of Sacramento, et al., v. Shalala, 38 F.3d 1225, 1227 (D.C. Cir. 1994). Thus, Congress required that the standardized rate applicable to each DRG be adjusted to reflect geographic variations in labor costs. Id. (citing 42 U.S.C. § 1395ww(d)(2)(H)).

This adjustment is called the "wage index" and it adjusts PPS payment rates to accommodate for regional variations in wage costs by taking into account the average hospital wage in a given geographic area as compared to the national average for hospital wages. Palisades General Hospital, at 401. The higher the wage index for the area in which a hospital is located, the more reimbursement the hospital will receive for each DRG payment for inpatient services. W.A. Foote Memorial Hospital v. Shalala, 2001

---

involves determinations made prior to the change in name, in the interest of consistency with the record, this brief will refer to the Agency as "HCFA."

U.S. Dist. LEXIS 24981 (S.D. MI 2001).  The wage index compares the average hourly

wage for hospitals in each geographic area with the national average hourly hospital

wage.  The wage index determination for its geographic area has a significant effect on

the amount reimbursement a hospital receives.  Robert Wood Johnson University

Hospital v. Thompson, 297 F.3d 273, 276 (3d Cir. 2002).

CMS groups hospitals into geographic areas based on Metropolitan Statistical

Areas (MSAs) as developed by the Office of Management and Budget and commonly

used by the federal government for many purposes.  Bellevue Hospital Center v. Leavitt,

443 F.3d 163, 169 (2d Cir. 2006).  The wage index must be recalculated each year.  Id.

This dispute centers on the Federal Fiscal Year 1999 wage index determination for

hospitals assigned to the Chicago MSA.  The appealing hospitals contend their wage

index was improperly determined by HCFA and the FI resulting in substantial PPS

underpayments.

II.    How Medicare Determines the Wage Index.

Medicare participating hospitals must annually file with their FI's a "cost report"

containing a wide range of information related to the costs of providing health care

services to patients.[2]  42 C.F.R. §§ 413.20 and 405.1801(b)(1).  The expenses and data

within the cost report include the total salaries and wage related costs paid by the hospital

and the total number of hours worked by the hospital employees during the period

---

[2] The initial purpose of cost reports was to determine final payment for services that were
reimbursed on a reasonable cost basis.  See 42 C.F.R. § 405.1801(a)(1).  Much of that
purpose has been diluted by increasing use of prospective or fee for service based
payment systems.  However, cost reports are still required for purposes of the limited
services still paid for on a cost basis, and to provide data affecting a variety of PPS issues
to include the wage index.  Accordingly, hospitals paid under PPS are expressly required
to file cost reports.  42 C.F.R. § 405.1801(b)(1).

covered by the cost report.  Parkview v. Shalala, 1997 WL 470107 (D.D.C. 1997) (Not

Reported in F.Supp.); Centra Health, 102 F.Supp.2d at 656.

Because of the substantial amount of time required for each provider to compile

and submit its annual cost report, and for the intermediary to review and audit them, there

is generally a four year lag between the cost report data used and the publication of the

wage index effective for the next FFY.  W.A. Foote, 2001 U.S.Dist. LEXIS at *4.  In this

case the initial data used by the FI and HCFA came from cost report data filed by

hospitals for 1995.  Provider Reimbursement Review Board Decision (hereinafter

PRRB), 2006-D7, Transcript, Volume I, p. 54, 56 (hereinafter "Tr., Vol. __, p. __.").

While the data used is four years old, the Secretary provides a process by which

hospitals may later correct errors in that data subject to deadlines set by the Secretary.  Id.

Hospitals could routinely request wage data corrections for purposes of the FFY 1999

wage index through mid-December 1997.  Id.  After HCFA considered this wage data

hospitals received an opportunity to examine a "public use file" containing the

preliminary 1995 data that HCFA would use and propose more corrections if they were

submitted by March 9, 1998.  Id.  On May 8, 1998 HCFA published a proposed wage

index and stated that additional corrections would be accepted only if they could not have

been known about during the March 1998 correction process.  Id., 63 Fed. Reg. 25576,

25589-25590.  HCFA published the final wage index that is in dispute on July 31, 1998.

63 Fed. Reg. 40954.[3]

---

[3] As discussed below, this was not the final opportunity to correct the wage index for
Plaintiff Hospitals.  The Secretary also offered an opportunity for a "mid-year correction"
to the FFY 1999 wage index.  The plaintiff hospitals requested this mid-year correction.
For reasons that Plaintiffs contend were arbitrary and capricious, the mid-year correction

Reduced to its basic level, the average hourly wage for each hospital is calculated by dividing total wage related costs paid by the total number of hours worked. The average hourly wage for all hospitals assigned to an MSA is then amalgamated to determine the average hourly wage for the MSA. This MSA hourly wage is divided by the national average hourly wage to establish a ratio that forms the basis of the wage index adjustment to PPS payments for hospitals assigned to that MSA. See Centra Health 102 F.Supp. at 656. For this reason, an error in the wage index data for one hospital can adversely affect the wage index determination and subsequent PPS payments for all hospitals in the same MSA. At issue in this case is the total number of paid hours for one hospital during the relevant cost reporting period used to establish the FFY 1999 wage index for the Chicago MSA.

III.    The Determination of the FFY 1999 Chicago Wage Index Adversely Affected the Plaintiffs.

Plaintiffs contend the FI and HCFA made and sustained an error that greatly inflated the total numbers of hours worked at Michael Reese Hospital and Medical Center (Michael Reese). Those erroneous additional hours were accumulated in total paid hours worked for the entire MSA adversely affecting Medicare payments to all the hospitals in the Chicago MSA. PRRB, 2006-D7, Tr., Vol. I, at p. 56. Thus, the greater number of hours determined for Michael Reese had the effect of decreasing the reimbursement for the Plaintiff hospitals subject to that area wage index. See Defendant's Answer, p. 6, ¶ 45. As the PRRB quite directly concluded, "There is no doubt that the 81 Providers in

_____

request was denied by the Secretary thereby cementing into place a full year of PPS payments that the Secretary knew were based on faulty data.

the Chicago MSA were adversely affected by the Reese Hospital wage data

determinations." Tr. Vol. I., p. 61.

> A.    *The FI Erroneously Adjusted "Total Hours Paid" When*
>        *Determining Michael Reese Hospital's Wage Index.*

Michael Reese (Medicare Provider No. 14-0075) is a large medical center serving

a financially distressed area of Chicago, Illinois.   Michael Reese originally filed its cost

report for the fiscal year ending ("FYE") 12/31/95 in May of 1996.   In this cost report,

Michael Reese reported total paid hours of 4,935,791 and an average hourly wage of

$16.77.  Agreed Upon Stipulation By the Parties, Tr., Vol. I, at p. 14-15.  ¶ 5  See also,

Tr., Vol. I, at p. 138.

On August 27, 1997, the Intermediary mailed a standard form letter to Michael

Reese requesting Wage Index data as part of its desk review for determining the Michael

Reese average hourly wage.  Tr., Vol. I, p. 140.  The available evidence supports, and the

Intermediary agrees, that Michael Reese did not respond to the Intermediary's August 27,

1997 letter.  Tr., Vol. I, p. 145 at ¶ 11.  See also PRRB, 2006-D7, Tr., Vol. I, at p. 57.

The Intermediary faxed another memorandum dated October 27, 1997, to Michael

Reese requesting Wage Index data.  Tr. Vol I, p. 154.  The October 27, 1997

memorandum, which was faxed on October 28, 1997, requested a response by November

3, 1997; less than one week after it was sent to Michael Reese.  Again, the available

evidence suggests that Michael Reese failed to respond to the Intermediary's October 27,

1997 memorandum.  Id.

The Intermediary prepared its October 27, 1997 memorandum because during the

initial stages of the desk audit for Michael Reese's Wage index, the Intermediary

determined material variances existed in Michael Reese's as-filed 1995 cost report Wage

Index data as compared to the prior year's data. For purposes of the Wage Index desk review process, HCFA mandated that an average hourly wage change from the prior year of greater than 10% would constitute a material variance. In the event of such a material variance, the Intermediary was required to examine the hospital's data through "appropriate means to determine the accuracy and propriety" thereof. Tr. Vol. I, p. 145 at ¶ 13. When the Intermediary compared Michael Reese's 1995 Wage Index data to that of the prior year, it revealed a materially significant decrease in the average hourly wage (*i.e.,* a decrease of more than 10% from FYE 1994 data). Id.

The Intermediary identified the greater than 10% decrease in the average hourly wage from the prior year as a material variance. Tr. Vol. I., p. 57. Thus, the Intermediary was obligated to examine the hospital's data through "appropriate means to determine the accuracy and propriety" of Wage Index data. Thus, the Intermediary sought from Michael Reese documentation to confirm total paid hours because its total paid hours were, by all appearances, already too high.

When Michael Reese failed to respond to the Intermediary's letter of August 27, 1997, or to the Intermediary's memorandum of October 27, 1997, the Intermediary apparently sought alternative documentation for total paid hours from Michael Reese's FYE 1995 cost report. Within the as-filed cost report, the Intermediary found a schedule supporting the cost allocation statistics for the cafeteria cost center, the Cafeteria Statistics Schedule. Tr. Vol. I., p. 57. This schedule utilized a measurement based on hours converted to full-time equivalents and contained hours that should not be used in

7

the "paid hours" calculation for wage index purposes.[4]  Nonetheless, the Intermediary used this document as the basis to adjust Michael Reese's total paid hours upwards to 6,491,307 when tabulating the Hospital's wage index.  Tr. Vol. I., p. 15.

Despite the fact that the Cafeteria Statistics Schedule had no relationship to the as-filed Wage Index data in Michael Reese's 1995 cost report, the Intermediary used the Cafeteria Statistics Schedule to unilaterally adjust the total paid hours from 4,935,791 to 6,491,307 (an increase of 1,555,516 hours, or 31.5%).  Because of the Intermediary's adjustments, Michael Reese's Average Hourly Wage decreased from $16.77 in its as-filed cost report, to $13.81.  Tr. Vol I., p. 210.

As a result of the Intermediary's adjustment, purportedly to "correct" an already too low average hourly wage, the average hourly wage further decreased from $16.77 as reported by Michael Reese to $13.81.  This was a decrease from the prior year of 32.8% and more than three times the Intermediary's materiality threshold that prompted the review.  The FI moved the total hours component involved in computing Michael Reese's Wage Index data in the *wrong direction* given the nature of the variances being investigated.

The Intermediary has provided no explanation why it made an adjustment that caused the average hourly wage to exceed its audit threshold by a factor of more than three times.  This adjustment was made without a request by Michael Reese to do so, without the input of Michael Reese, and without approval from Michael Reese.

---

[4] Because the Cafeteria Statistics Schedule included pay units used to calculate premium pay adjustments such as shift differential units, weekend differential units, charge nurse premiums, on-call time, etc., this was an improper source for the Intermediary to use in its desk audit for Michael Reese's Wage Index.

The parties agree that the Intermediary adjusted number of 6,491,307 is wrong, much too high, and included statistics that did not represent "paid hours." Accordingly, the cafeteria statistics should not have been used for Wage Index calculation purposes. The parties have stipulated that the proper total paid hours on line 1, column 4 of Worksheet S-3 should be 4,350,805 hours. Tr. Vol. I., p. 15 at ¶ 9.

There is no dispute that the Intermediary unilaterally increased total hours to the wrong number used in the Hospital Wage Index calculation from a number originally furnished by Michael Reese that was much closer to the correct hours. Id. at ¶ 6. The FI now acknowledges that the wage index determination of $13.81 per hour for Michael Reese was in error and that the correct wage costs per hour for Michael Reese was $17.02. Tr. Vol. I., p. 18.

As a result of the Intermediary's incorrect adjustment Michael Reese's total hours were overstated by 2,116,848 or 48%. Because the method of calculating the Hospital Wage Index is to divide total wage costs by total hours (producing an average hourly wage), this resulted in a clearly erroneous wage rate for Michael Reese of only $13.81 per hour or 32% less than the year before and the lowest Average Hourly Wage in the entire MSA by over $1.50 per hour. Tr. Vol I., p. 210.

B.     *Michael Reese Hospital Made Efforts to Correct the Error.*

On March 6, 1998, Columbia/HCA on behalf of Michael Reese, submitted a request to adjust certain aspects of its paid hours calculation, and this submission was accepted by the Intermediary on March 10, 1998. Tr. Vol. I., p. 212. At that time, Michael Reese knew something was wrong with its Wage Index, but had not identified the exact nature and extent of the error related to the excess entry of total hours paid.

Without knowing precisely what the Intermediary had done it was difficult for the hospital to identify the Intermediary's error. Accordingly, the Hospital Wage Index adjustments initially requested by Michael Reese did not include a specific request to adjust the total hours as increased by the Intermediary.

On March 25, 1998, the Intermediary faxed a letter to Michael Reese advising the Hospital of changes made as a result of Michael Reese's March 6, 1998 submission. Tr. Vol. I., pp. 216 – 229. These changes continued to include the improper increase of total paid hours by 1,555,513 to 6,491,307. Id. at 218. On June 4, 1998, the Intermediary faxed to Michael Reese a worksheet with Michael Reese's data continuing to reflect this erroneous total paid hours adjustment. Tr. Vol. I., p. 231.

C.    *HCFA and the Intermediary Deny a Mid-Year Correction.*

On November 19, 1998, HCFA published a rule in the Federal Register allowing for a two-week period for certain qualifying hospitals to discover and request correction of Wage Index errors. (63 Fed Reg. 64191; Tr. Vol. II., pp. 518-525). HCFA acknowledged that "certain aspects of the development of the FFY 1999 Wage Index may have led to some confusion among the hospital community" and that in light of the "totality of the circumstances," (Id. at 519) hospitals would be furnished an additional opportunity to request limited types of revisions in the wage data used to calculate the FFY 1999 Wage Index. HCFA blamed this industry confusion on a "unique confluence of circumstances relating to the development and application of the FFY 1999 wage index." Id. at 520. HCFA listed the "unique confluence of circumstances" as including:

-        The number of hospitals contacting HCFA with the same types of problems;

-       The hardship that might result for a number of hospitals if the wage data was not revised;

-       The changes to the Medicare cost report reflected for the first time in the FFY 1999 Wage Index;

-       The revised statutory timetable for publishing prospective payment rules effective for the first time for FFY 1999; and

-       The revised timetable for publishing the proposed and final wage data files applied for the first time when developing the FFY 1999 Wage Index.  Id. at 521.

       The November 19, 1998 Federal Register listed three independent criteria to be met in order to qualify for a Wage Index mid-year correction.  A hospital could qualify under any one of these independent criteria.  The third of these criteria allowed "mid-year" corrections if "the hospital properly requested a wage data revision by March 9, 1998, the fiscal intermediary approved a revision, (as reflected in a revised S-3), but the fiscal intermediary or HCFA made a data entry or tabulation error."  Id. at 520.  HCFA described this third criteria as "effectively extending the June 5, 1998 deadline for correcting certain data entry or tabulation errors."  Id. at 521.  Hospitals had until December 3, 1998 to send such wage data correction requests to HCFA.  Id. at 518.

       On November 30, 1998, Michael Reese timely requested a Hospital Wage Index mid-year adjustment under this third "Data Entry or Tabulation Errors" criteria.  Tr. Vol. I., pp. 238-240.  The request noted that there were ongoing negotiations as of June 5, 1998 related to Michael Reese's requested adjustments submitted March 6, 1998 and the additional exchange of information between Michael Reese and the Intermediary on June 4, 1998.  The application for mid-year adjustment also noted that the Intermediary made a

data entry or tabulation error by increasing the total paid hours to the wrong figure of 6,491,301.  The application stated that the correct total paid hours was 4,374,459 hours, very close to the number now stipulated as correct in this case.

 The application also noted that continuing this error would impact the hospitals subject to the Chicago MSA Hospital Wage Index by over $14 million.  The letter asked that HCFA apply the "totality of the circumstances" standard articulated in its November 19, 1998 Federal Register announcement to apply the Data Entry or Tabulation Error criteria for adjusting Michael Reese's Wage Index.

On December 1, 1998, the Metropolitan Chicago Healthcare Council, on behalf of Plaintiff hospitals, supported the Michael Reese application in a letter to HCFA citing the "significant hardship for all Chicago area hospitals" and noted that it "is exactly the type of hardship which prompted the November 19, 1998 Federal Register provision."  Tr. Vol. I., pp. 242-244.

The Intermediary was abrupt in its response.  In a one-page letter dated December 15, 1998, Mark Wanser at the Intermediary recommended to Valerie Miller at HCFA that HCFA deny the requested wage data revision.  Id. at 246.  The letter claimed "there was no data entry or tabulation error by either the FI or HCFA," even though the Intermediary both tabulated and entered the data resulting in an adjusted figure of 6,491,307 total paid hours, and even though that figure was clearly erroneous.    On February 25, 1999, HCFA released Federal Register provisions reporting final "approved requests for wage data revisions" that did not include the requested revisions for the Chicago MSA Wage Index and cemented into place the FI's erroneous, unilateral adjustment raising the hospital's total paid hours to 6,491,307.  (64 Fed. Reg. 9378.)  The parties have stipulated that this

number is in error and that the correct total paid hours for Michael Reese Hospital that should have been used in the FFY 1999 wage index determination is 4,374,805. Tr. Vol. I., p. 15 at ¶9.

IV.    Group Appeal Procedural History.

A.    *The Right to Appeal Wage Index Issues.*

On August 23, 1999, a total of 82 of the Chicago MSA hospitals subject to the Chicago Hospital Wage Index timely filed a Group Appeal with the PRRB. Id. 248-252. The PRRB is the administrative body charged with hearing Medicare reimbursement disputes between hospitals and Fiscal Intermediaries as part of the administrative review process for Medicare. Good Samaritan Hosp. v. Shalala, 135 F.3d. 493, 495 (7th Cir. 1998).

A provider has a right to a hearing for any "intermediary determination" (as "final determination") for the total amount of payment under PPS. 42 U.S.C. § 1395oo(a)(1)(A)(ii); 42 C.F.R. §§ 405.1803(a)(2) and 405.1835. Only certain PPS matters are not subject to appeal pursuant to 42 U.S.C. § 1395ww(d)(7), 42 C.F.R. §§ 405.1835(b) and 405.1804. These provisions prohibit appeal of the establishment of DRG rates, the methodology for classification of DRGs, and the weighting factors used to determine the relative hospital resources used with respect to each DRG. Thus, only limited aspects of such PPS determinations are exempt from administrative appeal, and subsequent judicial review, and those are explicitly stated.

Otherwise, the statute specifically grants providers the right to appeal PPS issues, as it states that a provider "may obtain a hearing with respect to such payment before the Board, if--(i) such provider . . . is dissatisfied with a final determination of the Secretary

as to the amount of payment under subsection (b) or (d) of section 1886."[5]  Section

1886(d) is the section related to PPS reimbursement and contains the relevant wage index

provisions at issue in this case at § 1886(d)(3)(E) of the Social Security Act, the parallel

citation for the previously cited and discussed § 1395ww(d)(3)(E) of the United States

Code.

The providers in this case are dissatisfied with the final determination of the

Secretary of the Medicare Wage Index for the FFY 1999 Chicago MSA.  As the PRRB

quite directly concluded, "There is no doubt that the 81 Providers in the Chicago MSA

were adversely affected by the Reese Hospital wage data determinations." Tr. Vol. I., p.

61.  The structure of the Medicare Act indicates that wage index issues are subject to

judicial review and are not protected by agency discretion.  Centra Health, 102 F.Supp.2d

at 658.[6]

B.     *Expedited Judicial Review*.

Judicial review without a PRRB hearing or substantive review of the issue by the

PRRB is permitted under a process called "expedited judicial review" (EJR) when the

PRRB determines the legal issue is beyond its authority to decide.  42 U.S.C. §

1395oo(f)(1) and 42 C.F.R. § 405.1842.  The effect of a PRRB decision referring the

matter for expedited judicial review is that  administrative remedies are exhausted and the

---

[5] These provisions were added by Congress to § 1395oo as "conforming amendments"
when Congress passed the Prospective Payment System and its purpose was to ensure
judicial review of PPS determinations.  Springdale Memorial Hospital v. Bowen, 818
F.2d 1377, 1380 (8th Cir. 1987).

[6] *See also* Bellevue Hospital Center, 443 F.3d 163, 169 (3d Cir. 1994) ("The Secretary
must, at least once annually compute a wage factor for each hospital 'reflecting' the
relative wage level in that hospital's 'geographic area'").

provider is permitted "to seek judicial review with respect to the matter or matters in controversy."  42 C.F.R. § 405.1842(h)(1).  Judicial review can provide a meaningful remedy if "the Secretary refused to make any revision to an erroneous wage index." Methodist Hospital of Sacramento, 38 F.3d at 1230.

This case is proceeding under the above-described process for expedited judicial review.  The PRRB may not grant expedited judicial review if factual or legal matters within its authority to decide remain at issue.  42 C.F.R. § 405.1842(g)(2).  As explained below, the PRRB has determined that the parties have stipulated to any factual issues that may have required its review.

C.    *Appeal History.*

Providers timely appealed the finalization of the FFY 1999 wage index for the Chicago MSA.  The appeal, as required by 42 U.S.C. § 1395oo, was filed with the PRRB and initially included Michael Reese Hospital.  Tr. Vol I., pp. 248-252.  Consistent with the PRRB's scheduling order, both sides filed "Position Papers" (essentially briefs with accompanying exhibits) with the Board.[7]  The Providers filed a Supplemental Position Paper (with additional exhibits) after receiving additional discovery documents subsequent to the filing of the Position Papers.[8]

On December 31, 2002 the FI filed a Brief and  Motion to Dismiss claiming the Board lacked jurisdiction over the matter.  Tr. Vol. II., pp. 813-1101.  Providers timely

---

[7] The respective Position Papers are part of the record of this case.  The Providers' Position Paper is found in Tr. Vol. I., pp. 99-128 with related exhibits in pp. 129-279. The Fiscal Intermediary's Position Paper is found in Tr. Vol I., pp. 348-391 with related exhibits following.

[8] Tr. Vol I., pp. 280-300.

responded with a Brief in support of Board jurisdiction.  Tr. Vol. II., pp. 675-812.  The

Board had scheduled a substantive hearing on the matter for November 17, 2003 but on

November 5, 2003 notified the parties that the hearing was delayed pending additional

consideration of the jurisdictional issue.  Tr. Vol. I., pp. 97.  On July 13, 2004 the Board

solicited additional comments on the jurisdictional question suggesting a lack of certainty

that it could provide relief to any provider other than Michael Reese.  Tr. Vol. I., pp. 95-

96.  However, the Board also made clear that it "does not question the fact that the

providers may file a group appeal seeking a change to the wage index for their [MSA]."

Id. at 96.

     At the invitation of the Board, Providers filed additional comments with the

Board regarding jurisdiction (Id. pp. 64-73) as did the FI (Id. pp. 74-94).  On December

15, 2005 the Board issued PRRB Decision No. 2006-D7 ruling on the jurisdictional

question.  Id. 54-63.  The Board dismissed Michael Reese Hospital from the appeal

claiming it had failed to exhaust administrative remedies and that the Board therefore had

no jurisdiction over that hospital.  Id. at 59.  However, the Board determined that the

remaining 81 hospitals in the appeal (the current plaintiffs in this case) did "not have any

administrative remedies to exhaust."  Id. at 61.  Accordingly, the Board concluded that "it

does have jurisdiction over the 81 Providers other than Reese."  Id. at 62.

     The Board directly acknowledged that "there is no doubt that the 81 other

Providers in the Chicago MSA were adversely affected by the Reese Hospital wage data

determinations."  Id. at 61.  However, the Board determined that it "lacks the authority to

grant the remedy sought: update of the Chicago wage index with Reese Hospital

corrected data."  Id. at 62.  The Board considered granting expedited judicial review to

allow correction of the matter within the courts, but declined to do so at that time because "there remains a disputed fact issue regarding whether the Reese wage data was incorrect, the case is not appropriate for expedited judicial review."  Id.  Acknowledging that this created an "anomalous result" the Board ruled it "must resolve the fact issue" under its jurisdictional authority over the remaining 81 providers.  Id.  The Board accordingly set the matter for hearing to be conducted on April 19, 2006.  Id. 21-22.

On April 12, 2006 the Providers and the Intermediary entered into a "Joint Stipulation of Agreed Upon Facts Between the Parties" that resolved the remaining fact issue that served as the basis for the Board's scheduled hearing.  Id. pp. 14-16.  The parties stipulated that "the correct count of total paid hours for Line 1 of Schedule S-3 is 4,350,805" and not the 6,491,307 as unilaterally adjusted by the FI.  Id. 15 at ¶¶ 6 and 9. The parties also jointly stipulated "that Expedited Judicial Review of this case is appropriate."  Id. at ¶ 10.

Accordingly, the Providers concurrently requested that the Board grant expedited judicial review of the matter.  Id. pp. 11-12.  The request for EJR noted that "the Providers have a jurisdictionally proper appeal" and that based on the record and stipulations that "there are no remaining findings of fact for resolution before the Board." Id. at 12.

On April 27, 2006 the Board granted expedited judicial review agreeing that with the stipulation there were "no findings of fact for resolution by the Board."  Id. pp. 1-3. Providers timely filed the present complaint and the parties have agreed there are no issues of material fact in dispute, thereby allowing the court to resolve this case through cross motions for summary judgment.

## STANDARD OF REVIEW

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the nonmoving party. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The parties in this case agree that there exist no genuine issues of material fact for trial. Thus, the question before the Court on the parties' cross-motions for summary judgment is the determination of whether the Plaintiffs or the Defendant is entitled to judgment as a matter of law.

On cross-motions for summary judgment, each movant must individually satisfy the requirements of Rule 56, <u>ITT Indus. Credit Co. v. D.S. Am., Inc.</u>, 674 F. Supp. 1330, 1331 (N.D. Ill. 1987), and the traditional rules for summary judgment apply, even though both parties have moved for summary judgment. <u>Blum v. Fisher and Fisher</u>, 961 F. Supp. 1218, 1222 (N.D. Ill. 1997).

**ARGUMENT**

I.    <u>The Calculation of Chicago Wage Index Does Not Comply With the Law</u>.

The statute pertaining to the calculation of the Hospital Wage Index is at 42 U.S.C. § 1395ww(d)(3)(E).  This statute unambiguously mandates that the Secretary shall establish wage indexes "reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level."

There is no question but that the determination by the FI and HCFA did not accurately measure "paid hours" and, as a result, the 1999 Chicago MSA Wage Index, as published in the February 25, 1999 Federal Register, did not reflect the relative wage level for Chicago area hospitals as compared to the national average hospital wage level.  The Intermediary has stipulated that the number of hours it chose to use to calculate the wage index for Michael Reese (and hence the entire Chicago MSA) of 6,491,307 was wrong and the "correct count for total paid hours" was 4,350,805.  Tr. Vol. I., p. 15 at ¶¶ 6 and 9.

The Medicare "Act *requires* the Secretary to create an index that *accurately* represents the relative wage levels of hospitals in a given MSA."  <u>Centra Health</u>, 102 F.Supp.2d at 660 (emphasis added).  The Secretary is "required to establish a wage index to create a uniform picture of what wage levels were at all provider hospitals" for the FFY at issue.  <u>Sarasota Memorial Hospital v. Shalala</u>, 60 F.3d 1507 (11th Cir. 1995).

Thus, the stipulation acknowledges that Medicare has failed, in this instance, to accurately reflect the relative wage level for Chicago area hospitals as compared to the national average, as is required by the plain language of the statute.

II.     <u>The Wage Index Determination for the Chicago MSA was Arbitrary and</u>
        <u>Capricious</u>.

      A.     *The FI Unilaterally Changed the Paid Hours From Michael Reese*
               *in the Wrong Direction.*

As discussed in the Facts section above, the Intermediary actually made most of

the error in Michael Reese's paid hours by its erroneous upward adjustment in hours.

Michael Reese reported on its initial cost report 4,935,791 total paid hours.  The

Intermediary, after misapplying documentation intended to support an unrelated B-1

cafeteria statistic, rather than Wage Index data, unilaterally and erroneously increased

this amount by 1,555,516 to the incorrect 6,491,307 total paid hours used by the

Intermediary and HCFA when determining the Wage Index for the Chicago MSA.  The

FI admits that it alone made this adjustment.  Tr. Vol I., p. 15 at ¶ 6.    The parties have

stipulated that 4,350,805 hours is the correct total paid hours figure that should have been

used.  Tr. Vol. I., p. 210.  Thus, most of the 2,140,502 hour error occurred as a result of

the Intermediary's improper adjustment.

The Intermediary unilaterally decided to use the Cafeteria Statistics Schedule in

lieu of actual Wage Index data.  As a consequence, the Intermediary tabulated and

entered data for Michael Reese's Wage Index that was drastically erroneous.  The

Intermediary should have identified such a major error on desk review because the Wage

Index for Michael Reese was so significantly reduced from the prior year and

substantially lower than other area hospitals.[9]  Tr. Vol. I., pp. 209-210.   The wage data

for the prior year using FYE 1994 data for Michael Reese established an average hourly

---

[9] As discussed, the FI did identify the aberration of the preliminary wage index data
indicating too low of a wage index determination for Michael Reese.  The FI then
engaged in a process that made the problem it was trying to fix worse.

wage rate used to compute the Wage Index of $20.56.  Id. at 243.  The Intermediary adjusted Michael Reese's Wage Index data to an hourly wage of only $13.81.  Id.  The Intermediary's desk audit not only failed to recognize this material error, it created the error by electing to use the Cafeteria Statistics Schedule (a totally inappropriate data source) to address a materially significant change from the prior year (a decrease of more than 10%) with patently illogical results--a further exaggeration of the very problem their additional review purported to address.   In so doing, the FI rejected total wage hours numbers from the hospital that were indisputably more accurate than the numbers used by the FI.

Indeed, the Intermediary was reviewing the Wage Index data to address a material decrease in the average wage from the year before, but its adjustments increased the very error it was investigating.  The Intermediary audited Michael Reese's Average Hourly Wage due to a likely error and then "fixed" the error by compounding the error.  The revision moved Michael Reese from near the median wage rate for hospitals in the MSA to last, and well behind the next lowest hospital by over $1.50 per hour.

When the approach used by the Secretary results in severe distortion of the wage index, then the approach used by the Fiscal Intermediary and Agency must be changed to "more accurately reflect the region's hospital wages."  Centra Health, 102 F.Supp.2d at 660.

B.   *Rather Than Use Wrong Data the FI Should Have Excluded Michael Reese Data From the Wage Index Determination.*

Rather than use data that HCFA and the FI knew or should have known was wrong, another option the Agency could have considered was simply excluding the obviously flawed Michael Reese data from the FFY 1999 wage index determination for

the Chicago MSA.  CMS has often removed data from the wage index determination

when the data that would be used "failed edits that could not be corrected" or where the

data received from hospitals was "incomplete or inaccurate."  71 Fed. Reg. 48015

(August 18, 2006).   HCFA has long claimed that "it is appropriate to eliminate data for

terminated hospitals when there is reason to believe the data are incorrect, and the data

cannot be verified."  59 Fed. Reg. 45330, 45353 (September 1, 1994).  In this case, while

the Hospital was not terminated, there was reason to believe the data was incorrect and by

the Intermediary's own admission it could not be verified due to the Hospital's failure to

respond to inquiries on the matter.

> III.   The Refusal to Make a "Mid-Year Adjustment to the
>        Chicago MSA Wage Index was Arbitrary and Capricious.
>
>> A.   *A HCFA regulation created the opportunity  for a "mid-year"*
>>      *Wage Index correction.*

No matter who is at fault for the original error in the Chicgao MSA wage index

determination, HCFA and the Intermediary had an opportunity to make a mid-year

adjustment of the Wage Index.  Recognizing that there were numerous systemic errors

creating "a unique confluence of circumstances relating to the development and

application of the FFY 1999 wage index" (63 Fed. Reg. 64191, 64193; Tr. Vol. II., pp.

520)   HCFA allowed for a one time mid-year correction of wage indexes due to the

"totality of circumstances."  Id. at 519.

>> B.   *The Requested Mid-Year Correction Was Arbitrarily Denied.*

One basis for a mid-year correction was when "the Fiscal Intermediary or HCFA

made a data entry or tabulation error."  Id. at 520.  As previously discussed, the Fiscal

Intermediary itself tabulated and made the data entry that the parties have since stipulated was in error.

The Defendant admits that the Fiscal Intermediary made the data entry of 6,491,307 hours used in the wage index determination at issue. Tr. Vol. I. p. 6 at ¶ 6. In his Answer to Plaintiffs' Complaint the Defendant's complete response was "Admits" to ¶ 42 of the Complaint that "The fiscal intermediary unilaterally modified Michael Reese Hospital's as filed total paid hours and forwarded to CMS a determination of total paid hours for Michael Reese Hospital of 6,491,307." Accordingly, the parties agree that the data entry of 6,491,307 was the unilateral act of the Fiscal Intermediary.

The Defendant also admits that the 6,491,307 hours entered by the Defendant's FI as the total paid hours data for Michael Reese Hospital was not correct and that the correct number was 4,350,805 hours. Tr. Vol. I. p. 6 at ¶ 9.[10]

---

[10] The Defendant's response in his Answer on this point is unnecessarily evasive. The Defendant in ¶ 44 of his Answer states as follows:

> "This paragraph contains Plaintiffs' characterization of an April 12, 2006 stipulation between the parties to the PRRB proceedings, which speaks for itself. Defendant denies any such characterization and respectfully refers the Court to the stipulation for a full and accurate statement of its contents."

In light of this qualified denial it may be helpful to compare Plaintiffs' characterization of the stipulation in ¶ 44 of their Complaint to the stipulation itself. The Complaint in ¶ 44 characterized the stipulation as follows:

> "The Fiscal Intermediary and the Plaintiffs have since stipulated that the correct count of total paid hours for Michael Reese Hospital should have been 4,350,805."

The relevant point in ¶ 9 of the stipulation reads:

> "The parties now agree that the correct count for total paid hours for Line 1 of Schedule S-3 is 4,350,805."

Yet, the Defendant arbitrarily and capriciously denied this mid-year correction, refusing to correct a wage index determination that Defendant acknowledges its agent unilaterally made and was not correct.

## CONCLUSION

For the foregoing reasons there exists no genuine issue of material fact and the Plaintiffs are entitled to judgment as a matter of law. The Secretary and the FI unilaterally determined paid hours for Michael Reese Hospital that the parties have stipulated was not correct. This determination was arbitrary and capricious and not in accord with the law. Having made the error with improper data of its own choosing in the first place, Medicare and the FI then arbitrarily and capriciously refused to make a mid-year correction of their own mistake.

This court should not allow these errors and arbitrary and capricious decisions to stand. The Court should order the program to make corrected payments to the Provider hospitals so that the hospitals are paid what they are properly due for the provision of inpatient services to Medicare patients during FFY 1999.

---

Under the circumstances it is difficult to discern what forms the basis for any good faith denial by the Defendant to ¶ 44 of Plaintiffs' Complaint. The Plaintiffs certainly agree that the stipulation speaks for itself.

Respectfully submitted,

HALL, RENDER, KILLIAN, HEATH & LYMAN,
P.C.


s/  N. Kent Smith
L. Richard Gohman, Attorney No. 7179-49
N. Kent Smith, Attorney No. 1777-49
Keith D. Barber, Attorney No. 19052-49
Suite 2000, Box 82064, One American Square
Indianapolis, IN  46282
(317) 633-4884
*Attorneys for the Plaintiffs*



LAW OFFICE OF BRAD KELLY, P.C.



s/  Bradley L. Kelly
Bradley Kelly, D.C. Bar No. 292623
7700 Old Georgetown Road
Bethesda, MD  20814
(301) 656-7707
*Attorneys for the Plaintiffs*

25

## CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of January, 2007, a copy of the foregoing was

filed electronically.  Parties may access this filing through the Court's system.

Kenneth Wainstein
Megan Rose
United States Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
megan.rose@usdoj.gov; Richard.dolci@usdoj.gov

Paul E. Soeffing
U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
Room C2-05-23
7500 Security Boulevard
Baltimore, MD 21244-1850
paul.soeffing@hhs.gov


                              s/  Brad Kelly                                        

Law Office of Brad Kelly, P.C.
7700 Old Georgetown Road
Bethesda, MD 20814
(301) 656-7707
*Attorney for Plaintiffs*
540010v1

26