UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ADVENTIST GLENOAKS                )
HOSPITAL, et al.,                 )
                                  )
       Plaintiffs,                )
                                  )
       v.                         )     Case Number   1:06-CV-01206
                                  )
MICHAEL O. LEAVITT,               )
Secretary, United States Department )
of Health and Human Services,     )
                                  )
       Defendant.                 )

**PLAINTIFFS' COURT ORDERED REVISED MEMORANDUM IN SUPPORT
OF MOTION FOR SUMMARY JUDGMENT**

## I.     INTRODUCTION

In its Order of March 31, 2008, the Court required the parties to submit rebriefing on the motions for summary judgment to expressly address the following two questions:

     a)     Whether and when Plaintiffs knew or could have known that the total hours data submitted by Michael Reese hospital (MRH) and subsequently altered by the fiscal intermediary was incorrect?

     b)     Whether there exists a process by which **Plaintiffs** (not MRH) could have challenged the errors in MRH's data and by when that process should have commenced?

Simply stated the answer to both questions is "no." The questions presented by the Court are fully brief in the Argument section of this Brief at section V(B)(2) on pages 23 through 29 below. For the reasons stated herein, there is no genuine issue as to any material fact and the Plaintiffs are entitled to judgment as a matter of law.

## II.    STATEMENT OF THE ISSUE

Did the Health Care Financing Administration, and its Fiscal Intermediary, properly determine the Medicare "wage index" for Medicare participating hospitals subject to the Chicago Metropolitan Statistical Area wage index for Federal Fiscal Year (FFY) 1999?

## III.    STATEMENT OF THE FACTS

The parties agree there are no material facts in dispute. Plaintiff's incorporate herein their Amended Statement of Material Facts as to Which There is No Genuine Issue filed contemporaneously with this brief.

### A.    Background.

Medicare is a federal health insurance program that pays for medical care for people 65 years of age or older, certain younger disabled people, and people with end stage renal disease. 42 U.S.C. § 1395ww *et seq*. The Secretary of Health and Human Services (the Secretary) is responsible for administering the program through the Health Care Financing Administration (HCFA)[1] and its Fiscal Intermediaries (FIs). The FI is generally a private insurance company contracted by HCFA to administer Medicare Part A (hospital inpatient) payment functions in a given area.

For acute care inpatient services, hospitals are paid on a Prospective Payment System ("PPS"). 42 U.S.C. § 1395ww(d). Under PPS, hospitals are generally paid a

---

[1] In the Spring of 2001, the Health Care Financing Administration (HCFA) changed its name to the Centers for Medicare and Medicaid Services (CMS). Because the issue involves determinations made prior to the change in name, in the interest of consistency with the record, this brief will refer to the Agency as "HCFA."

predetermined amount based on the discharge diagnosis of patients as determined by their category of illness treated  or "Diagnostic Related Group."  See generally, 42 U.S.C. § 1395ww.  This diagnosis driven payment is fixed regardless of the hospital's actual cost of rendering services to a particular patient.  Palisades General Hospital Inc. v. Leavitt, 426 F.3d 400, 401 (D.C. Cir. 2005); Centra Health, Inc. v. Shalala, 102 F.Supp.2d 654, 656 (W.D. Va, 2000).

When establishing PPS Congress recognized that fixed DRG payments would need to be adjusted to accommodate geographic variations in labor costs.  Methodist Hospital of Sacramento, et al., v. Shalala, 38 F.3d. 1225, 1227 (D.C. Cir. 1994).  Thus, Congress required that the standardized rate applicable to each DRG  be adjusted to reflect geographic variations in labor costs.  Id. (citing 42 U.S.C. § 1395ww(d)(2)(H)).

This adjustment is called the "wage index" and it adjusts PPS payment rates to accommodate for regional variations in wage costs by taking into account the average hospital wage in a given geographic area as compared to the national average for hospital wages.  Palisades General Hospital, at 401.  The higher the wage index for the area in which a hospital is located, the more reimbursement the hospital will receive for each DRG payment for inpatient services.  W.A. Foote Memorial Hospital v. Shalala, 2001 U.S. Dist. LEXIS 24981 (S.D. MI 2001).  The wage index compares the average hourly wage for hospitals in each geographic area with the national average hourly hospital wage.  The wage index determination for its geographic area has a significant effect on the amount reimbursement a hospital receives.  Robert Wood Johnson University Hospital v. Thompson, 297 F.3d 273, 276 (3d Cir. 2002).

CMS groups hospitals into geographic areas based on Metropolitan Statistical Areas (MSAs) as developed by the Office of Management and Budget and commonly used by the federal government for many purposes. Bellevue Hospital Center v. Leavitt, 443 F.3d 163, 169 (2d Cir. 2006). The wage index must be recalculated each year. Id. This dispute centers on the Federal Fiscal Year 1999 wage index determination for hospitals assigned to the Chicago MSA. The appealing hospitals contend their wage index was improperly determined by HCFA and the FI resulting in substantial PPS underpayments.

**B.     How Medicare Determines the Wage Index.**

Medicare participating hospitals must annually file with their FI's a "cost report" containing a wide range of information related to the costs of providing health care services to patients.[2] 42 C.F.R. §§ 413.20 and 405.1801(b)(1). The expenses and data within the cost report include the total salaries and wage related costs paid by the hospital and the total number of hours worked by the hospital employees during the period covered by the cost report. Parkview v. Shalala, 1997 WL 470107 (D.D.C. 1997) (Not Reported in F.Supp.); Centra Health, 102 F.Supp.2d at 656.

Because of the substantial amount of time required for each provider to compile and submit its annual cost report, and for the intermediary to review and audit them, there is generally a four year lag between the cost report data used and the publication of the

---

[2] The initial purpose of cost reports was to determine final payment for services that were reimbursed on a reasonable cost basis. See 42 C.F.R. § 405.1801(a)(1). Much of that purpose has been diluted by increasing use of prospective or fee for service based payment systems. However, cost reports are still required for purposes of the limited services still paid for on a cost basis, and to provide data affecting a variety of PPS issues to include the wage index. Accordingly, hospitals paid under PPS are expressly required to file cost reports. 42 C.F.R. § 405.1801(b)(1).

wage index effective for the next FFY.  <u>W.A. Foote</u>, 2001 U.S.Dist. LEXIS at *4.  In this

case the initial data used by the FI and HCFA came from cost report data filed by

hospitals for 1995.  Provider Reimbursement Review Board Decision (hereinafter

PRRB), 2006-D7, Transcript, Volume I, p. 54, 56 (hereinafter "Tr., Vol. __, p. __.").

     While the data used is four years old, the Secretary provides a process by which

hospitals may later correct errors in their data subject to deadlines set by the Secretary.

<u>Id</u>.  Hospitals could routinely request wage data corrections for purposes of the FFY 1999

wage index through mid-December 1997.  <u>Id</u>.  After HCFA considered this wage data

hospitals received an opportunity to examine a "public use file" containing the

preliminary 1995 data that HCFA would use and propose more corrections if they were

submitted by March 9, 1998.  <u>Id</u>.  On May 8, 1998 HCFA published a proposed wage

index and stated that additional corrections would be accepted only if they could not have

been known about during the March 1998 correction process.  <u>Id</u>., 63 Fed. Reg. 25576,

25589-25590.  HCFA published the final wage index that is in dispute on July 31, 1998.

63 Fed. Reg. 40954.[3]

     Reduced to its basic level, the average hourly wage for each hospital is calculated

by dividing total wage related costs paid by the total number of hours worked.  The

average hourly wage for all hospitals assigned to an MSA is then amalgamated to

determine the average hourly wage for the MSA.  This MSA hourly wage is divided by

---

[3] As discussed below, this was not the final opportunity to correct the wage index for
Plaintiff Hospitals.  The Secretary also offered an opportunity for a "mid-year correction"
to the FFY 1999 wage index.  The plaintiff hospitals requested this mid-year correction.
For reasons that Plaintiffs contend were arbitrary and capricious, the mid-year correction
request was denied by the Secretary thereby cementing into place a full year of PPS
payments that the Secretary knew were based on faulty data.

the national average hourly wage to establish a ratio that forms the basis of the wage index adjustment to PPS payments for hospitals assigned to that MSA.  See Centra Health 102 F.Supp. at 656.  For this reason, an error in the wage index data for one hospital can adversely affect the wage index determination and subsequent PPS payments for all hospitals in the same MSA.   At issue in this case is the total number of paid hours for one hospital during the relevant cost reporting period used to establish the FFY 1999 wage index for the Chicago MSA.

      C.    **The Determination of the FFY 1999 Chicago Wage Index Adversely Affected the Plaintiffs.**

Plaintiffs contend the FI and HCFA made and sustained an error that greatly inflated the total numbers of hours worked at Michael Reese Hospital and Medical Center (Michael Reese).  Those erroneous additional hours were accumulated in total paid hours worked for the entire MSA adversely affecting Medicare payments to all the hospitals in the Chicago MSA.   PRRB, 2006-D7, Tr., Vol. I, at p. 56.  Thus, the greater number of hours determined for Michael Reese had the effect of decreasing the reimbursement for the Plaintiff hospitals subject to that area wage index.  See Defendant's Answer, p. 6, ¶ 45.  As the PRRB quite directly concluded, "There is no doubt that the 81 Providers in the Chicago MSA were adversely affected by the Reese Hospital wage data determinations."  Tr. Vol. I., p. 61.

      1.    *The FI Erroneously Adjusted "Total Hours Paid" When Determining Michael Reese Hospital's Wage Index.*

Michael Reese (Medicare Provider No. 14-0075) is a large medical center serving a financially distressed area of Chicago, Illinois.   Michael Reese originally filed its cost report for the fiscal year ending ("FYE") 12/31/95 in May of 1996.   In this cost report,

Michael Reese reported total paid hours of 4,935,791 and an average hourly wage of $16.77. Agreed Upon Stipulation By the Parties, Tr., Vol. I, at p. 14-15. ¶ 5 See also, Tr., Vol. I, at p. 138.

On August 27, 1997, the Intermediary mailed a standard form letter to Michael Reese requesting Wage Index data as part of its desk review for determining the Michael Reese average hourly wage. Tr., Vol. I, p. 140. The available evidence supports, and the Intermediary agrees, that Michael Reese did not respond to the Intermediary's August 27, 1997 letter. Tr., Vol. I, p. 145 at ¶ 11. See also PRRB, 2006-D7, Tr., Vol. I, at p. 57.

The Intermediary faxed another memorandum dated October 27, 1997, to Michael Reese requesting Wage Index data. Tr. Vol. I, p. 154. The October 27, 1997 memorandum, which was faxed on October 28, 1997, requested a response by November 3, 1997; less than one week after it was sent to Michael Reese. Again, the available evidence suggests that Michael Reese failed to respond to the Intermediary's October 27, 1997 memorandum. Id.

The Intermediary prepared its October 27, 1997 memorandum because during the initial stages of the desk audit for Michael Reese's Wage index, the Intermediary determined material variances existed in Michael Reese's as-filed 1995 cost report Wage Index data as compared to the prior year's data. For purposes of the Wage Index desk review process, HCFA mandated that an average hourly wage change from the prior year of greater than 10% would constitute a material variance. In the event of such a material variance, the Intermediary was required to examine the hospital's data through "appropriate means to determine the accuracy and propriety" thereof. Tr. Vol. I, p. 145 at ¶ 13. When the Intermediary compared Michael Reese's 1995 Wage Index data to that of

the prior year, it revealed a materially significant decrease in the average hourly wage (*i.e.,* a decrease of more than 10% from FYE 1994 data). <u>Id</u>.

The Intermediary identified the greater than 10% decrease in the average hourly wage from the prior year as a material variance. Tr. Vol. I., p. 57. Thus, the Intermediary was obligated to examine the hospital's data through "appropriate means to determine the accuracy and propriety" of Wage Index data. Thus, the Intermediary sought from Michael Reese documentation to confirm total paid hours because its total paid hours were, by all appearances, already too high.

When Michael Reese failed to respond to the Intermediary's letter of August 27, 1997, or to the Intermediary's memorandum of October 27, 1997, the Intermediary apparently sought alternative documentation for total paid hours from Michael Reese's FYE 1995 cost report. Within the as-filed cost report, the Intermediary found a schedule supporting the cost allocation statistics for the cafeteria cost center, the Cafeteria Statistics Schedule. Tr. Vol. I., p. 57. This schedule utilized a measurement based on hours converted to full-time equivalents and contained hours that should not be used in the "paid hours" calculation for wage index purposes.[4] Nonetheless, the Intermediary used this document as the basis to adjust Michael Reese's total paid hours upwards to 6,491,307 when tabulating the Hospital's wage index. Tr. Vol. I., p. 15.

Despite the fact that the Cafeteria Statistics Schedule had no relationship to the as-filed Wage Index data in Michael Reese's 1995 cost report, the Intermediary used the

---

[4] Because the Cafeteria Statistics Schedule included pay units used to calculate premium pay adjustments such as shift differential units, weekend differential units, charge nurse premiums, on-call time, etc., this was an improper source for the Intermediary to use in its desk audit for Michael Reese's Wage Index.

Cafeteria Statistics Schedule to unilaterally adjust the total paid hours from 4,935,791 to 6,491,307 (an increase of 1,555,516 hours, or 31.5%). Because of the Intermediary's adjustments, Michael Reese's Average Hourly Wage decreased from $16.77 in its as-filed cost report, to $13.81. Tr. Vol I., p. 210.

As a result of the Intermediary's adjustment, purportedly to "correct" an already too low average hourly wage, the average hourly wage further decreased from $16.77 as reported by Michael Reese to $13.81. This was a decrease from the prior year of 32.8% and more than three times the Intermediary's materiality threshold that prompted the review. The FI moved the total hours component involved in computing Michael Reese's Wage Index data in the *wrong direction* given the nature of the variances being investigated.

The Intermediary has provided no explanation why it made an adjustment that caused the average hourly wage to exceed its audit threshold by a factor of more than three times. This adjustment was made without a request by Michael Reese to do so, without the input of Michael Reese, and without approval from Michael Reese.

The parties agree that the Intermediary adjusted number of 6,491,307 is wrong, much too high, and included statistics that did not represent "paid hours." Accordingly, the cafeteria statistics should not have been used for Wage Index calculation purposes. The parties have stipulated that the proper total paid hours on line 1, column 4 of Worksheet S-3 should be 4,350,805 hours. Tr. Vol. I., p. 15 at ¶ 9.

There is no dispute that the Intermediary unilaterally increased total hours to the wrong number used in the Hospital Wage Index calculation from a number originally furnished by Michael Reese that was much closer to the correct hours. Id. at ¶ 6. The FI

now acknowledges that the wage index determination of $13.81 per hour for Michael

Reese was in error and that the correct wage costs per hour for Michael Reese was

$17.02. Tr. Vol. I., p. 18.

As a result of the Intermediary's incorrect adjustment Michael Reese's total hours

were overstated by 2,116,848 or 48%. Because the method of calculating the Hospital

Wage Index is to divide total wage costs by total hours (producing an average hourly

wage), this resulted in a clearly erroneous wage rate for Michael Reese of only $13.81

per hour or 32% less than the year before and the lowest Average Hourly Wage in the

entire MSA by over $1.50 per hour.  Tr. Vol I., p. 210.

2.    *Michael Reese Hospital Made Efforts to Correct the Error*.

On March 6, 1998, Columbia/HCA on behalf of Michael Reese, submitted a

request to adjust certain aspects of its paid hours calculation, and this submission was

accepted by the Intermediary on March 10, 1998. Tr. Vol. I., p. 212. At that time,

Michael Reese knew something was wrong with its Wage Index, but had not identified

the exact nature and extent of the error related to the excess entry of total hours paid.

Without knowing precisely what the Intermediary had done it was difficult for the

hospital to identify the Intermediary's error. Accordingly, the Hospital Wage Index

adjustments initially requested by Michael Reese did not include a specific request to

adjust the total hours as increased by the Intermediary.

On March 25, 1998, the Intermediary faxed a letter to Michael Reese advising the

Hospital of changes made as a result of Michael Reese's March 6, 1998 submission.  Tr.

Vol. I., pp. 216 – 229.  These changes continued to include the improper increase of total

paid hours by 1,555,513 to 6,491,307. Id. at 218.  On June 4, 1998, the Intermediary

faxed to Michael Reese a worksheet with Michael Reese's data continuing to reflect this erroneous total paid hours adjustment.  Tr. Vol. I., p. 231.

3.     *HCFA and the Intermediary Deny a Mid-Year Correction.*

On November 19, 1998, HCFA published a rule in the Federal Register allowing for a two-week period for certain qualifying hospitals to discover and request correction of Wage Index errors.  (63 Fed Reg. 64191; Tr. Vol. II., pp. 518-525).  HCFA acknowledged that "certain aspects of the development of the FFY 1999 Wage Index may have led to some confusion among the hospital community" and that in light of the "totality of the circumstances," (Id. at 519) hospitals would be furnished an additional opportunity to request limited types of revisions in the wage data used to calculate the FFY 1999 Wage Index.  HCFA blamed this industry confusion on a "unique confluence of circumstances relating to the development and application of the FFY 1999 wage index."  Id. at 520.  HCFA listed the "unique confluence of circumstances" as including:

-     The number of hospitals contacting HCFA with the same types of problems;

-     The hardship that might result for a number of hospitals if the wage data was not revised;

-     The changes to the Medicare cost report reflected for the first time in the FFY 1999 Wage Index;

-     The revised statutory timetable for publishing prospective payment rules effective for the first time for FFY 1999; and

-     The revised timetable for publishing the proposed and final wage data files applied for the first time when developing the FFY 1999 Wage Index.  Id. at 521.

11

The November 19, 1998 Federal Register listed three independent criteria to be met in order to qualify for a Wage Index mid-year correction. A hospital could qualify under any one of these independent criteria. The third of these criteria allowed "mid-year" corrections if "the hospital properly requested a wage data revision by March 9, 1998, the fiscal intermediary approved a revision, (as reflected in a revised S-3), but the fiscal intermediary or HCFA made a data entry or tabulation error." Id. at 520. HCFA described this third criteria as "effectively extending the June 5, 1998 deadline for correcting certain data entry or tabulation errors." Id. at 521. Hospitals had until December 3, 1998 to send such wage data correction requests to HCFA. Id. at 518.

On November 30, 1998, Michael Reese timely requested a Hospital Wage Index mid-year adjustment under this third "Data Entry or Tabulation Errors" criteria. Tr. Vol. I., pp. 238-240. The request noted that there were ongoing negotiations as of June 5, 1998 related to Michael Reese's requested adjustments submitted March 6, 1998 and the additional exchange of information between Michael Reese and the Intermediary on June 4, 1998. The application for mid-year adjustment also noted that the Intermediary made a data entry or tabulation error by increasing the total paid hours to the wrong figure of 6,491,301. The application stated that the correct total paid hours was 4,374,459 hours, very close to the number now stipulated as correct in this case.

The application also noted that continuing this error would impact the hospitals subject to the Chicago MSA Hospital Wage Index by over $14 million. The letter asked that HCFA apply the "totality of the circumstances" standard articulated in its November 19, 1998 Federal Register announcement to apply the Data Entry or Tabulation Error criteria for adjusting Michael Reese's Wage Index.

On December 1, 1998, the Metropolitan Chicago Healthcare Council, on behalf of Plaintiff hospitals, supported the Michael Reese application in a letter to HCFA citing the "significant hardship for all Chicago area hospitals" and noted that it "is exactly the type of hardship which prompted the November 19, 1998 Federal Register provision." Tr. Vol. I., pp. 242-244.

The Intermediary was abrupt in its response. In a one-page letter dated December 15, 1998, Mark Wanser at the Intermediary recommended to Valerie Miller at HCFA that HCFA deny the requested wage data revision. Id. at 246. The letter claimed "there was no data entry or tabulation error by either the FI or HCFA," even though the Intermediary both tabulated and entered the data resulting in an adjusted figure of 6,491,307 total paid hours, and even though that figure was clearly erroneous.    On February 25, 1999, HCFA released Federal Register provisions reporting final "approved requests for wage data revisions" that did not include the requested revisions for the Chicago MSA Wage Index and cemented into place the FI's erroneous, unilateral adjustment raising the hospital's total paid hours to 6,491,307. (64 Fed. Reg. 9378.) The parties have stipulated that this number is in error and that the correct total paid hours for Michael Reese Hospital that should have been used in the FFY 1999 wage index determination is 4,374,805. Tr. Vol. I., p. 15 at ¶9.

     **D.**     **Group Appeal Procedural History.**

         1.    *The Right to Appeal Wage Index Issues.*

On August 23, 1999, a total of 82 of the Chicago MSA hospitals subject to the Chicago Hospital Wage Index timely filed a Group Appeal with the PRRB. Id. 248-252. The PRRB is the administrative body charged with hearing Medicare reimbursement

disputes between hospitals and Fiscal Intermediaries as part of the administrative review

process for Medicare.  Good Samaritan Hosp. v. Shalala, 135 F.3d. 493, 495 (7th Cir.

1998).

A provider has a right to a hearing for any "intermediary determination" (as "final

determination") for the total amount of payment under PPS.  42 U.S.C. §

1395oo(a)(1)(A)(ii); 42 C.F.R. §§ 405.1803(a)(2) and 405.1835.  Only certain PPS

matters are not subject to appeal pursuant to 42 U.S.C. § 1395ww(d)(7), 42 C.F.R. §§

405.1835(b) and 405.1804.  These provisions prohibit appeal of the establishment of

DRG rates, the methodology for classification of DRGs, and the weighting factors used

to determine the relative hospital resources used with respect to each DRG.  Thus, only

limited aspects of such PPS determinations are exempt from administrative appeal, and

subsequent judicial review, and those are explicitly stated.

Otherwise, the statute specifically grants providers the right to appeal PPS issues,

as it states that a provider "may obtain a hearing with respect to such payment before the

Board, if--(i) such provider . . . is dissatisfied with a final determination of the Secretary

as to the amount of payment under subsection (b) or (d) of section 1886."[5]  Section

1886(d) is the section related to PPS reimbursement and contains the relevant wage index

provisions at issue in this case at § 1886(d)(3)(E) of the Social Security Act, the parallel

citation for the previously cited and discussed § 1395ww(d)(3)(E) of the United States

Code.

---

[5] These provisions were added by Congress to § 1395oo as "conforming amendments"
when Congress passed the Prospective Payment System and its purpose was to ensure
judicial review of PPS determinations.  Springdale Memorial Hospital v. Bowen, 818
F.2d 1377, 1380 (8th Cir. 1987).

The providers in this case are dissatisfied with the final determination of the Secretary of the Medicare Wage Index for the FFY 1999 Chicago MSA.  As the PRRB quite directly concluded, "There is no doubt that the 81 Providers in the Chicago MSA were adversely affected by the Reese Hospital wage data determinations."  Tr. Vol. I., p. 61.  The structure of the Medicare Act indicates that wage index issues are subject to judicial review and are not protected by agency discretion.  <u>Centra Health</u>, 102 F.Supp.2d at 658.[6]

2.     *Expedited Judicial Review*.

Judicial review without a PRRB hearing or substantive review of the issue by the PRRB is permitted under a process called "expedited judicial review" (EJR) when the PRRB determines the legal issue is beyond its authority to decide.  42 U.S.C. § 1395oo(f)(1) and 42 C.F.R. § 405.1842.  The effect of a PRRB decision referring the matter for expedited judicial review is that  administrative remedies are exhausted and the provider is permitted "to seek judicial review with respect to the matter or matters in controversy."  42 C.F.R. § 405.1842(h)(1).  Judicial review can provide a meaningful remedy if "the Secretary refused to make any revision to an erroneous wage index." <u>Methodist Hospital of Sacramento</u>, 38 F.3d at 1230.

This case is proceeding under the above-described process for expedited judicial review.  The PRRB may not grant expedited judicial review if factual or legal matters within its authority to decide remain at issue.  42 C.F.R. § 405.1842(g)(2).  As explained

---

[6] *See also* <u>Bellevue Hospital Center</u>, 443 F.3d 163, 169 (3d Cir. 1994) ("The Secretary must, at least once annually compute a wage factor for each hospital 'reflecting' the relative wage level in that hospital's 'geographic area'").

below, the PRRB has determined that the parties have stipulated to any factual issues that may have required its review.

3.    *Appeal History.*

Providers timely appealed the finalization of the FFY 1999 wage index for the Chicago MSA.  The appeal, as required by 42 U.S.C. § 1395oo, was filed with the PRRB and initially included Michael Reese Hospital.  Tr. Vol I., pp. 248-252.  Consistent with the PRRB's scheduling order, both sides filed "Position Papers" (essentially briefs with accompanying exhibits) with the Board.[7]  The Providers filed a Supplemental Position Paper (with additional exhibits) after receiving additional discovery documents subsequent to the filing of the Position Papers.[8]

On December 31, 2002 the FI filed a Brief and  Motion to Dismiss claiming the Board lacked jurisdiction over the matter.  Tr. Vol. II., pp. 813-1101.  Providers timely responded with a Brief in support of Board jurisdiction.  Tr. Vol. II., pp. 675-812.  The Board had scheduled a substantive hearing on the matter for November 17, 2003 but on November 5, 2003 notified the parties that the hearing was delayed pending additional consideration of the jurisdictional issue.  Tr. Vol. I., pp. 97.  On July 13, 2004 the Board solicited additional comments on the jurisdictional question suggesting a lack of certainty that it could provide relief to any provider other than Michael Reese.  Tr. Vol. I., pp. 95-96.  However, the Board also made clear that it "does not question the fact that the

---

[7] The respective Position Papers are part of the record of this case.  The Providers' Position Paper is found in Tr. Vol. I., pp. 99-128 with related exhibits in pp. 129-279.  The Fiscal Intermediary's Position Paper is found in Tr. Vol I., pp. 348-391 with related exhibits following.

[8] Tr. Vol I., pp. 280-300.

providers may file a group appeal seeking a change to the wage index for their [MSA]."
Id. at 96.

At the invitation of the Board, Providers filed additional comments with the
Board regarding jurisdiction (Id. pp. 64-73) as did the FI (Id. pp. 74-94).  On December
15, 2005 the Board issued PRRB Decision No. 2006-D7 ruling on the jurisdictional
question.  Id. 54-63.  The Board dismissed Michael Reese Hospital from the appeal
claiming it had failed to exhaust administrative remedies and that the Board therefore had
no jurisdiction over that hospital.  Id. at 59.  However, the Board determined that the
remaining 81 hospitals in the appeal (the current plaintiffs in this case) did "not have any
administrative remedies to exhaust."  Id. at 61.  Accordingly, the Board concluded that "it
does have jurisdiction over the 81 Providers other than Reese."  Id. at 62.

The Board directly acknowledged that "there is no doubt that the 81 other
Providers in the Chicago MSA were adversely affected by the Reese Hospital wage data
determinations."  Id. at 61.  However, the Board determined that it "lacks the authority to
grant the remedy sought: update of the Chicago wage index with Reese Hospital
corrected data."  Id. at 62.  The Board considered granting expedited judicial review to
allow correction of the matter within the courts, but declined to do so at that time because
"there remains a disputed fact issue regarding whether the Reese wage data was incorrect,
the case is not appropriate for expedited judicial review."  Id.  Acknowledging that this
created an "anomalous result" the Board ruled it "must resolve the fact issue" under its
jurisdictional authority over the remaining 81 providers.  Id.  The Board accordingly set
the matter for hearing to be conducted on April 19, 2006.  Id. 21-22.

On April 12, 2006 the Providers and the Intermediary entered into a "Joint Stipulation of Agreed Upon Facts Between the Parties" that resolved the remaining fact issue that served as the basis for the Board's scheduled hearing.  Id. pp. 14-16.  The parties stipulated that "the correct count of total paid hours for Line 1 of Schedule S-3 is 4,350,805" and not the 6,491,307 as unilaterally adjusted by the FI.  Id. 15 at ¶¶ 6 and 9. The parties also jointly stipulated "that Expedited Judicial Review of this case is appropriate."  Id. at ¶ 10.

Accordingly, the Providers concurrently requested that the Board grant expedited judicial review of the matter.  Id. pp. 11-12.  The request for EJR noted that "the Providers have a jurisdictionally proper appeal" and that based on the record and stipulations that "there are no remaining findings of fact for resolution before the Board." Id. at 12.

On April 27, 2006 the Board granted expedited judicial review agreeing that with the stipulation there were "no findings of fact for resolution by the Board."  Id. pp. 1-3. Providers timely filed the present complaint and the parties agreed there were no issues of material fact in dispute, thereby allowing the court to resolve this case through cross motions for summary judgment.

On March 31, 2008 this Court issued an order denying the both of the competing cross motions for summary judgment without prejudice and ordering the parties to refile their motions for summary judgment and to address the following two questions from the court:

a)  Whether and when Plaintiffs knew or could have known that the total hours data submitted by Michael Reese Hospital (MRH) and subsequently altered by the fiscal intermediary was incorrect?

b)  Whether there exists a process by which **Plaintiffs** (not MRH) could have challenged the errors in MRH's data and by when that process should have commenced?

## IV.    <u>STANDARD OF REVIEW</u>

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Summary judgment is appropriate where the pleadings, depositions, answers to interrogatories, affidavits and other materials demonstrate that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  When deciding a motion for summary judgment, the court considers those facts that are undisputed and views additional evidence, and all reasonable inferences drawn therefrom, in the light reasonably most favorable to the nonmoving party.  See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The parties in this case agree that there exist no genuine issues of material fact for trial.  Thus, the question before the Court on the parties' cross-motions for summary judgment is the determination of whether the Plaintiffs or the Defendant is entitled to judgment as a matter of law.

On cross-motions for summary judgment, each movant must individually satisfy the requirements of Rule 56, <u>ITT Indus. Credit Co. v. D.S. Am., Inc.</u>, 674 F. Supp. 1330,

1331 (N.D. Ill. 1987), and the traditional rules for summary judgment apply, even though both parties have moved for summary judgment.  <u>Blum v. Fisher and Fisher</u>, 961 F. Supp. 1218, 1222 (N.D. Ill. 1997).

**V.    <u>ARGUMENT</u>**

**A.    <u>The Calculation of Chicago Wage Index Does Not Comply With the Law</u>.**

The statute pertaining to the calculation of the Hospital Wage Index is at 42 U.S.C. § 1395ww(d)(3)(E).  This statute unambiguously mandates that the Secretary shall establish wage indexes "reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level."

There is no question but that the determination by the FI and HCFA did not accurately measure "paid hours" and, as a result, the 1999 Chicago MSA Wage Index, as published in the February 25, 1999 Federal Register, did not reflect the relative wage level for Chicago area hospitals as compared to the national average hospital wage level. The Intermediary has stipulated that the number of hours it chose to use to calculate the wage index for Michael Reese (and hence the entire Chicago MSA) of 6,491,307 was wrong and the "correct count for total paid hours" was 4,350,805.  Tr. Vol. I., p. 15 at ¶¶ 6 and 9.

The Medicare "Act *requires* the Secretary to create an index that *accurately* represents the relative wage levels of hospitals in a given MSA."  <u>Centra Health</u>, 102 F.Supp.2d at 660 (emphasis added).  The Secretary is "required to establish a wage index to create a uniform picture of what wage levels were at all provider hospitals" for the FFY at issue.  <u>Sarasota Memorial Hospital v. Shalala</u>, 60 F.3d 1507 (11th Cir. 1995).

20

Thus, the stipulation acknowledges that Medicare has failed, in this instance, to accurately reflect the relative wage level for Chicago area hospitals as compared to the national average, as is required by the plain language of the statute.

**B.     The Wage Index Determination for the Chicago MSA was Arbitrary and Capricious.**

      1.     *The FI Unilaterally Changed the Paid Hours From Michael Reese in the Wrong Direction.*

As discussed in the Facts section above, the Intermediary actually made most of the error in Michael Reese's paid hours by its erroneous upward adjustment in hours. Michael Reese reported on its initial cost report 4,935,791 total paid hours. The Intermediary, after misapplying documentation intended to support an unrelated B-1 cafeteria statistic, rather than Wage Index data, unilaterally and erroneously increased this amount by 1,555,516 to the incorrect 6,491,307 total paid hours used by the Intermediary and HCFA when determining the Wage Index for the Chicago MSA. The FI admits that it alone made this adjustment. Tr. Vol I., p. 15 at ¶ 6.   The parties have stipulated that 4,350,805 hours is the correct total paid hours figure that should have been used. Tr. Vol. I., p. 210. Thus, most of the 2,140,502 hour error occurred as a result of the Intermediary's improper adjustment.

The Intermediary unilaterally decided to use the Cafeteria Statistics Schedule in lieu of actual Wage Index data. As a consequence, the Intermediary tabulated and entered data for Michael Reese's Wage Index that was drastically erroneous. The Intermediary should have identified such a major error on desk review because the Wage Index for Michael Reese was so significantly reduced from the prior year and

substantially lower than other area hospitals.[9] Tr. Vol. I., pp. 209-210.   The wage data for the prior year using FYE 1994 data for Michael Reese established an average hourly wage rate used to compute the Wage Index of $20.56.  Id. at 243.  The Intermediary adjusted Michael Reese's Wage Index data to an hourly wage of only $13.81.  Id.

The Intermediary's desk audit not only failed to recognize this material error, it created the error by electing to use the Cafeteria Statistics Schedule (a totally inappropriate data source) to address a materially significant change from the prior year (a decrease of more than 10%) with patently illogical results--a further exaggeration of the very problem their additional review purported to address.   In so doing, the FI rejected total wage hours numbers from the hospital that were indisputably more accurate than the numbers used by the FI.

Indeed, the Intermediary was reviewing the Wage Index data to address a material decrease in the average wage from the year before, but its adjustments increased the very error it was investigating.  The Intermediary audited Michael Reese's Average Hourly Wage due to a likely error and then "fixed" the error by compounding the error.  The revision moved Michael Reese from near the median wage rate for hospitals in the MSA to last, and well behind the next lowest hospital by over $1.50 per hour.

When the approach used by the Secretary results in severe distortion of the wage index, then the approach used by the Fiscal Intermediary and Agency must be changed to "more accurately reflect the region's hospital wages." Centra Health, 102 F.Supp.2d at 660.

---

[9] As discussed, the FI did identify the aberration of the preliminary wage index data indicating too low of a wage index determination for Michael Reese.  The FI then engaged in a process that made the problem it was trying to fix worse.

2.    *The Plaintiffs In This Case Could Not Have Known of the Error or Challenged The Errors at Another Hospital Except as They Have Done.*

As stated above, the Court in its March 31, 2008, order required the parties to submit new cross motions for summary judgment and to explicitly brief the Court on the following two questions:

a)  Whether and when Plaintiffs knew or could have known that the total hours data submitted by Michael Reese Hospital (MRH) and subsequently altered by the fiscal intermediary was incorrect?

b)  Whether there exists a process by which **Plaintiffs** (not MRH) could have challenged the errors in MRH's data and by when that process should have commenced?

Simply put, the answer to both these questions is "no."

a.    <u>CMS Does Not Provide Data to Hospitals By Which Hospitals Can Detect Errors In the Wage Index Data For Other Hospitals</u>.

As established in the facts above, hospitals file their own individual cost reports with CMS for which the wage index data for each individual hospital is derived.[10] During the wage index correction process CMS does not report hospital specific detailed information with underlying documentation or data.  Rather CMS provides only summary statistics that only provide for each Provider the "avg hour wage" determination for each hospital.[11]

---

[10] Plaintiffs note that their initial Memorandum In Opposition to Defendant's Motion to Summary Judgment and in Reply to Defendant's Opposition to Plaintiffs' Motion for Summary Judgment did briefly discuss the inability of Plaintiff hospitals to discover the MRH's error or correct it.  See Plaintiffs' Memo In Opposition and Reply, pp. 10-11.

[11] The information furnished in the Federal Register Proposed Rule to Plaintiff hospitals for Michael Reese Hospital can be observed by this Court at 63 Fed. Reg. 25625 (May 8,

The total wage costs, and total paid hours, and underlying supporting data that would be necessary for Plaintiff hospitals in this case to possibly discern that MRH's wage data was in error was not reported by the Defendant in the Federal Register. Expecting other hospitals to know whether this determination is in error is akin to the IRS publishing nothing more than proposed paid taxes for individual taxpayers and then expecting other taxpayers to know that one of the many others is in error.

As Defendant acknowledges, the Defendant's notices regarding MRH's specific data were sent to MRH and not to any of the Plaintiffs. (Defendant's Statement of Material Facts as to Which There is No Genuine Issue, ¶ 2).

> b.   *CMS Wage Index Adjustment Instructions Allow for Data Adjustment Requests to Come Only From the Hospital Whose Data Is At Issue*.

The ability of only the specific reporting hospital (in this case MRH) to determine and document errors in proposed hospital specific wage indices is also reflected in the instructions (for the relevant cost reporting and wage index correction process year). These instructions clearly permit only the hospital whose cost report data is at issue to seek corrections for its wage data.

For example:

> "A hospital can verify its adjusted average hourly wage . . . based on wage data on the hospital's cost report."  --63 Fed. Reg. 40971 (July 31, 1998)

---

2008) in the line for Provider 140075 (the Provider Number for Michael Reese Hospital). Only three numbers are provided. The aforementioned Provider Number, the case mix index, and the average hourly wage determination for that Provider. As discussed below, CMS expects each Provider to take that average hourly wage determination and compare it to the that Hospital's own underlying data to ensure it is correct. However, even the CMS instructions make clear that only the specific Hospital with that underlying data can request changes to their proposed wage index determination.

"If after reviewing the August data file or information in this final rule, a hospital believes that its wage data are incorrect due to a fiscal intermediary or HCFA error in the entry or tabulation of the final wage data, it should send a letter to both its fiscal intermediary and HCFA." --62 Fed. Reg. 45989 (August 29, 1997)

"Immediately following the development of the final wage index, a second wage data file is made available in mid-August so that hospitals may again verify the accuracy of their wage data.  If a hospital detects an error made by the intermediary or HCFA in the handling (entry or transmission) of the wage data the hospital may request a correction."  --62 Fed. Reg. 45990 (August 29, 1997).

These instructions make clear that only the hospital with underlying cost reporting data for its cost report can identify potential errors in its HCFA supplied wage index data and (for that reason) only that hospital can request correction of the same during the wage index correction process.  As the Defendant's initial brief on this matter acknowledges, "the Secretary in his FY 1999 PPS rulemaking established a procedure by which hospitals could request correction of **their** 1995 wage survey data."  (Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment, p. 6 (emphasis added)).

The Plaintiffs note that Defendant's use of the phrase "their 1995 wage survey data" (as opposed to the data of other hospitals) is quite clear.  The Defendant's Brief is similar to the language above where the Secretary repeatedly refers to "a hospital" seeking correction to "its" own wage data and not to other hospitals seeking correction of another hospital's data.  Indeed, the Defendant's original brief makes much of repeating that "CMS relies on hospitals to correctly report their wage data and gives them numerous opportunities to correct inaccuracies in **their** wage data."  Id. at 18 (emphasis added).  CMS (and its fiscal intermediaries) not only relies on such accuracy, but

demands and receives from hospitals the underlying data and documentation in support of such data from hospitals, data not available to Plaintiff hospitals during the wage index correction process. Thus, Plaintiff hospitals were dependent on the processes established by CMS to ensure that other hospitals accurately submit wage index data.

As the above authorities establish, there is no reasonable means by which the Plaintiff hospitals could have, on their own, detected that MRH submitted erroneous data. Plaintiffs would have had even less means to know that the Fiscal Intermediary would unilaterally change the data submitted by MRH. The only entity with the ability to discern that the Fiscal Intermediary had done so was MRH when the Fiscal Intermediary returned those adjustments to MRH. However, MRH is not a party to this case.

> c.    *The PRRB In This Case Has Already Determined (and the parties have agreed) That There Is No Process (other than by appeal through the PRRB) For Hospitals to Request Wage Index Adjustments For Data From Other Hospitals.*

As the above shows, even if the Plaintiffs had identified the error, there is no CMS proscribed process for them to request adjustment to another hospital's data, except through the very process used by Plaintiffs in this case, appeal through the PRRB after publication of the wage index in the Federal Register. As the PRRB has noted, "neither the enabling statute nor regulation explicitly addresses the process by which a provider or group of providers can request exclusion of another facility's data from the wage index calculation . . . Moreover there seems to be no formal process that CMS uses for this

purpose." *JFK-Raritan-Hunterdon 03 Wage Index Group v. BCBSA*, PRRB Hearing

Dec. No. 2007-D2 (Oct. 11, 2006) *in* CCH Medicare and Medicaid Guide, ¶ 81,617.[12]

It is also worth noting the Board's characterization of the present case before this

court in its *JFK-Raritan* decision.  In explaining their conclusion that "there is no

statutory or regulatory administrative process here that providers must exhaust" when

appealing a decision related to another hospital's wage data, the Board explained in a

footnote:

> See e.g. Chicago Wage 98-00 MSA Wage Index Group v. Mutual of
> Omaha Insurance Co., PRRB Dec. No. 2006-D7, December 15, 2005.
> Where a hospital failed to exhaust administrative procedures established to
> correct a hospital's own data, the Board lacked jurisdiction for the appeal
> of the provider whose data was in issue.  **However, other providers in
> the MSA who were impacted by the incorrect data had no
> administrative remedies to exhaust and therefore had jurisdiction**
> pursuant to 42 U.S.C. § 1395oo(a) and the regulations at 42 C.F.R. §
> 405.1835.  Those authorities provide that a provider receiving payments in
> amounts computed under PPS has the right to a hearing before the Board
> with respect to such payments provided other criteria for jurisdictional
> criteria are met.  The "amount of payment" for PPS hospitals is defined at
> § 1395oo(d) to include the wage index.

Id. at Note 6.

The above quoted footnote is about the case currently before this Court and the

"other providers" with "no administrative remedies to exhaust" in the above footnote are

the Plaintiffs in this case.  The decision the Board was referring to in Note 6 of *JFK-

Raritan* is in the record of this case.  Tr. Vol. I., pp. 54-63.

The PRRB's statement in *JFK-Raritan* about the Board's decision in present case

further suggests a definitive conclusion regarding the two questions presented by this

---

[12] The Administrator did not review this decision and CMS did not appeal this decision
into federal court.  Thus, CMS has effectively acquiesced to the PRRB's decision in *JFK–
Raritan Bay*.

Court.  MRH was dismissed from the present case because it had administrative remedies

and failed to exhaust them.  Had the Plaintiffs in this matter similarly have been able to

know about the MRH errors, and had they administrative remedies during the wage index

correction process to request correction of those errors, they would have suffered the

same fate as MRH and would have been dismissed from this case by the Board.

As the fate of MRH demonstrated, failure to exhaust administrative remedies is a

jurisdictional bar for review by the PRRB.  However, the PRRB expressly concluded that

"the Board has jurisdiction of the claims of the 81 Providers in the Chicago MSA other

than Michael Reese."  Tr. Vol I., p. 62.  The Board reached this conclusion because the

Board could not find any authority "for a hospital to challenge another hospital's wage

data in the data correction administrative correction process."  Tr. Vol I., p. 61.  Thus, the

Board held that "unlike Reese, the other 81 hospitals do not have any administrative

remedies to exhaust."  Id.[13]

The stipulation to the PRRB by the government's representative that Expedited

Judicial Review was appropriate (Tr. Vol. I., p. 15) would not have been appropriate if

the Government contends that the Plaintiffs had administrative remedies that they failed

to exhaust for MRH's wage data errors.   In its decision to grant Expedited Judicial

Review, the PRRB again stated that "the 81 remaining providers did not have any

administrative remedies to exhaust."  Tr. Vol. I., p. 2.  Accordingly, the PRRB explicitly

found again that "it has jurisdiction over the matter" something that would not be true had

the Plaintiffs failed to exhaust administrative remedies.  Id.

---

[13] The PRRB even commented that the Secretary had the authority to establish such an
administrative review process to challenge wage data from other hospitals, but made
clear no such process existed for the Plaintiffs in this case.  Tr. Vol. I., p. 61.

At no point has the Government contested these findings.  In fact, the issue should be considered resolved by the Defendant's averment that there are no material facts about which there is disagreement and that "all material facts are those found in the record." (Defendant's Response to Plaintiff's Statement of Material Facts As to Which There is No Genuine Issue, p. 1).  As discussed above, the facts in the record, as recognized by the PRRB, include that there is no administrative process "for a hospital to challenge another hospital's wage data in the data correction administrative correction process" and that accordingly the 81 Plaintiffs in this case did not have any administrative remedies to exhaust.  If the Defendant's position were that the Plaintiffs could have known about MRH's data errors, and that a process existed for the Plaintiffs to request correction of that data (other than the process taken by Plaintiffs in this case), then these materially factual issues would be in dispute.

That these facts are not in dispute is further established by the Defendant's Answer to Plaintiff's Complaint.  Paragraph seven of the Complaint asserted that "This Court has jurisdiction over this action . . ."  The Defendant's answer did not challenge this assertion stating only that paragraph seven of the Complaint contained "conclusions of law to which no response is required."  If Plaintiffs were jurisdictionally barred due to failure to exhaust administrative remedies, an answer from Defendant to that effect was certainly required.

The evidence is clear from an undisputed record that Plaintiffs had no means to know of the MRH's errors and, even if they had, that there was no process for them to challenge those errors except by the appeal process through that PRRB utilized by Plaintiffs after publication of the final wage index in the Federal Register.

3.    *Rather Than Use Wrong Data the FI Should Have Excluded*
      *Michael Reese Data From the Wage Index Determination.*

Rather than use data that HCFA and the FI knew or should have known was wrong, another option the Agency could have considered was simply excluding the obviously flawed Michael Reese data from the FFY 1999 wage index determination for the Chicago MSA. CMS has often removed data from the wage index determination when the data that would be used "failed edits that could not be corrected" or where the data received from hospitals was "incomplete or inaccurate." 71 Fed. Reg. 48015 (August 18, 2006). HCFA has long claimed that "it is appropriate to eliminate data for terminated hospitals when there is reason to believe the data are incorrect, and the data cannot be verified." 59 Fed. Reg. 45330, 45353 (September 1, 1994). In this case, while the Hospital was not terminated, there was reason to believe the data was incorrect and by the Intermediary's own admission it could not be verified due to the Hospital's failure to respond to inquiries on the matter.

C.    **The Refusal to Make a "Mid-Year Adjustment to the**
       **Chicago MSA Wage Index was Arbitrary and Capricious.**

1.    *A HCFA regulation created the opportunity for a "mid-year"*
      *Wage Index correction.*

No matter who is at fault for the original error in the Chicgao MSA wage index determination, HCFA and the Intermediary had an opportunity to make a mid-year adjustment of the Wage Index. Recognizing that there were numerous systemic errors creating "a unique confluence of circumstances relating to the development and application of the FFY 1999 wage index" (63 Fed. Reg. 64191, 64193; Tr. Vol. II., pp. 520) HCFA allowed for a one time mid-year correction of wage indexes due to the "totality of circumstances." Id. at 519.

2.    *The Requested Mid-Year Correction Was Arbitrarily Denied.*

One basis for a mid-year correction was when "the Fiscal Intermediary or HCFA made a data entry or tabulation error."  Id. at 520.  As previously discussed, the Fiscal Intermediary itself tabulated and made the data entry that the parties have since stipulated was in error.

The Defendant admits that the Fiscal Intermediary made the data entry of 6,491,307 hours used in the wage index determination at issue.  Tr. Vol. I. p. 6 at ¶ 6.  In his Answer to Plaintiffs' Complaint the Defendant's complete response was "Admits" to ¶ 42 of the Complaint that "The fiscal intermediary unilaterally modified Michael Reese Hospital's as filed total paid hours and forwarded to CMS a determination of total paid hours for Michael Reese Hospital of 6,491,307."  Accordingly, the parties agree that the data entry of 6,491,307 was the unilateral act of the Fiscal Intermediary.

The Defendant also admits that the 6,491,307 hours entered by the Defendant's FI as the total paid hours data for Michael Reese Hospital was not correct and that the correct number was 4,350,805 hours.  Tr. Vol. I. p. 6 at ¶ 9.[14]

---

[14] The Defendant's response in his Answer on this point is unnecessarily evasive.  The Defendant in ¶ 44 of his Answer states as follows:

> "This paragraph contains Plaintiffs' characterization of an April 12, 2006 stipulation between the parties to the PRRB proceedings, which speaks for itself.  Defendant denies any such characterization and respectfully refers the Court to the stipulation for a full and accurate statement of its contents."

In light of this qualified denial it may be helpful to compare Plaintiffs' characterization of the stipulation in ¶ 44 of their Complaint to the stipulation itself.  The Complaint in ¶ 44 characterized the stipulation as follows:

Yet, the Defendant arbitrarily and capriciously denied this mid-year correction, refusing to correct a wage index determination that Defendant acknowledges its agent unilaterally made and was not correct.

## VI.    CONCLUSION

For the foregoing reasons there exists no genuine issue of material fact and the Plaintiffs are entitled to judgment as a matter of law.  The Secretary and the FI unilaterally determined paid hours for Michael Reese Hospital that the parties have stipulated was not correct.  This determination was arbitrary and capricious and not in accord with the law.  Having made the error with improper data of its own choosing in the first place, Medicare and the FI then arbitrarily and capriciously refused to make a mid-year correction of their own mistake.

This court should not allow these errors and arbitrary and capricious decisions to stand.  The Court should order the program to make corrected payments to the Provider hospitals so that the hospitals are paid what they are properly due for the provision of inpatient services to Medicare patients during FFY 1999.

---

"The Fiscal Intermediary and the Plaintiffs have since stipulated that the correct count of total paid hours for Michael Reese Hospital should have been 4,350,805."

The relevant point in ¶ 9 of the stipulation reads:

"The parties now agree that the correct count for total paid hours for Line 1 of Schedule S-3 is 4,350,805."

Under the circumstances it is difficult to discern what forms the basis for any good faith denial by the Defendant to ¶ 44 of Plaintiffs' Complaint.  The Plaintiffs certainly agree that the stipulation speaks for itself.

32

Respectfully submitted,

HALL, RENDER, KILLIAN, HEATH & LYMAN,
P.C.

s/  N. Kent Smith
N. Kent Smith, Attorney No. 1777-49
Keith D. Barber, Attorney No. 19052-49
Suite 2000, Box 82064, One American Square
Indianapolis, IN  46282
(317) 633-4884
*Attorneys for the Plaintiffs*

LAW OFFICE OF BRAD KELLY, P.C.

s/  Bradley L. Kelly
Bradley Kelly, D.C. Bar No. 292623
7700 Old Georgetown Road
Bethesda, MD  20814
(301) 656-7707
*Attorneys for the Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of June, 2008, a copy of the foregoing was

filed electronically.  Parties may access this filing through the Court's system.

Christopher Blake Harwood
Charlotte A. Able
United States Attorney's Office
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
christopher.harwood@usdoj.gov; charlotte.abel@usdoj.gov

Mark Polston
Paul Edwin Soeffing
U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
Room C2-05-23
7500 Security Boulevard
Baltimore, MD 21244-1850
Mark.Polston@hhs.gov; paul.soeffing@hhs.gov


s/  Brad Kelly

Law Office of Brad Kelly, P.C.
7700 Old Georgetown Road
Bethesda, MD 20814
(301) 656-7707
*Attorney for Plaintiffs*
715497v1