## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ADVENTIST GLENOAKS HOSPITAL, | ) | |
| et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil No. 06-1206 (EGS) |
| | ) | |
| MICHAEL O. LEAVITT, Secretary of | ) | **ECF** |
| Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(b), Defendant, Michael O. Leavitt, Secretary of Health and Human Services, by and through his undersigned counsel, respectfully moves this Court for summary judgment on the grounds that there are no material facts in dispute and that Defendant is entitled to judgment as a matter of law. In support of the instant motion, the Court is respectfully referred to the accompanying Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment.

A proposed order is attached.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR
United States Attorney

_____/s/_____
CHRISTOPHER B. HARWOOD
Assistant United States Attorney
N.Y. Registration No. 4202982
Judiciary Center Building
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 307-0372


_____/s/_____
ANDREW B. SPALDING
Attorney
D.C. Bar No. 501297
U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
5309 Cohen Building
330 Independence Avenue S.W.
Washington, D.C.  20201
(202) 205-8705

OF COUNSEL:

THOMAS R. BARKER
Acting General Counsel

JANICE L. HOFFMAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
for Litigation

United States Department of
Health and Human Services

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| ADVENTIST GLENOAKS HOSPITAL, | ) | |
|    et al., | ) | |
| | ) | |
|        Plaintiffs, | ) | |
| | ) | |
|        v. | ) | Civil No. 06-1206 (EGS) |
| | ) | |
| MICHAEL O. LEAVITT, Secretary of | ) | **ECF** |
|    Health and Human Services, | ) | |
| | ) | |
|        Defendant. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN**
**OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

Plaintiffs are hospitals located in the Chicago, Illinois area that participate in the

Medicare program.  Plaintiffs have brought this action against Defendant Michael O. Leavitt,

Secretary of Health and Human Services ("the Secretary"), seeking judicial review of the

Secretary's determination of the wage index component of Medicare's hospital inpatient

Prospective Payment System ("PPS") for the Chicago, Illinois Metropolitan Statistical Area

("Chicago MSA") for Federal Fiscal Year ("FFY") 1999.  Plaintiffs complain that uncorrected

errors in the wage data of a Chicago hospital, Michael Reese Hospital ("MRH"), that is not party

to this lawsuit, deflated the Chicago MSA wage index to the detriment of all hospitals subject to

the Chicago MSA wage index.  As shown below, however, the Secretary's treatment of the

Chicago hospitals' wage data was consistent with the Medicare statute and the Secretary's

regulations, and was thus entirely lawful.

After the case was fully briefed, the Court issued a March 31, 2008 Order denying both

the Plaintiffs' and the Defendant's motions for summary judgment without prejudice, and further

ordering the parties to refile their motions addressing: 1) whether and when Plaintiffs knew or

could have known that the data for MRH was incorrect; and 2) whether there exists a process by

which Plaintiffs could have challenged those errors.  Contrary to Plaintiffs' contention, Plaintiffs

could have known of the error and did in fact have a process available to challenge those errors,

as is explained below at pages 24-29.

## II.  STATUTORY AND REGULATORY FRAMEWORK

### A.  Part A of the Medicare Program Generally

Title XVIII of the Social Security Act ("Medicare statute") establishes the Medicare

program, a federally funded health insurance program that provides payment for covered

services furnished to aged and certain disabled persons.  See generally 42 U.S.C. § 1395-

1395ggg.  Part A of the program, which is at issue in this case, authorizes payment for covered

institutional care, including hospitals.  42 U.S.C. §§ 1395c, 1395d, 1395i, 1395x(b), (i).  The

Medicare program is administered by the Centers for Medicare & Medicaid Services ("CMS")

which is a component agency of the Department of Health and Human Services.[1]

Part A services are furnished by "providers of services."  42 U.S.C. §§ 1395x(u).

Providers of services must enter into agreements with the Secretary in order to participate in and

obtain payment from the Medicare program.  See 42 U.S.C. §§ 1395g, 1395cc.  Most hospitals

that have entered into such agreements, including Plaintiffs, are reimbursed under Medicare's

prospective payment system ("PPS").  Part A reimbursement is made through a "fiscal

---

[1] CMS was formerly known as the Health Care Financing Administration ("HCFA").  The agency was renamed CMS in 2001.  66 Fed. Reg. 35,437 (July 5, 2001).

intermediary," a private entity that acts as the Secretary's agent.  42 U.S.C. § 1395h.  Each

provider submits to its intermediary at the end of their fiscal year ("FY") a cost report setting

forth all costs for which the provider claims reimbursement.  42 C.F.R. § 405.1801(b)(1).  The

intermediary then reviews the cost report and determines in a notice of program reimbursement

how much reimbursement is actually due the provider for that cost year.

     A provider that is dissatisfied with a final determination of the Secretary as to the amount

of reimbursement due may, upon compliance with the statutorily imposed jurisdictional

requirements, request a hearing before the Provider Reimbursement Review Board ("PRRB" or

the "Board").  42 U.S.C. § 1395oo(a), (b).  Multiple providers may join in a single group appeal

to the PRRB, as in the instant case, if the controversy involves a common question of fact or

interpretation of law or regulation.  42 U.S.C. § 1395oo(b); 42 C.F.R. § 405.1837.  If all the

jurisdictional prerequisites are satisfied and the PRRB has the authority to decide the matter at

issue, see 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842, the PRRB may hold a hearing and

issue a decision that is potentially subject to further review by the Secretary's delegate, the CMS

Administrator.  See 42 C.F.R. § 405.1875.  The statute authorizes a provider to request judicial

review of the final agency decision in federal district court within 60 days of the provider's

receipt of the final decision of either the PRRB or the Secretary, if the Secretary reverses the

PRRB's decision.  42 U.S.C. § 1395oo(f)(1).

     The Secretary's final determination of the inpatient prospective payment wage index,

described in detail below, is a determination that a provider can appeal to the PRRB.  See, e.g.,

Sarasota Mem'l Hosp. v. Shalala, 848 F. Supp. 974, 978 (M.D. Fla. 1994), rev'd on other

grounds, 60 F.3d 1507 (11th Cir. 1995).  If, on the other hand, the PRRB lacks the authority to

decide the question presented – such as a question of the facial validity of a statutory or regulatory provision – the PRRB may grant "expedited judicial review" ("EJR") which authorizes the provider to proceed to district court within 60 days of the PRRB's EJR determination.  42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842.

**B.  The PPS System of Medicare Payments to Hospitals**

Currently, payments to most hospitals, including Plaintiffs here, for the operating costs of inpatient services are based upon prospectively determined rates that vary according to the category of hospital treatment rendered.  42 U.S.C. § 1395ww(d).  The specific payment rate to be applied depends upon which "diagnosis related group" ("DRG") best characterizes the patient's diagnosis and treatment.  42 U.S.C. § 1395ww(d)(1)(A)(iii)(3), (4).  The Secretary publishes in the Federal Register a proposed rule on or about May 1, and a final rule on or about August 1, announcing the PPS payment rates for the upcoming Federal FY, which begins on October 1.  42 U.S.C. § 1395ww(d)(6).

The Medicare statute contains a complex formula for calculating prospective payment rates.  The rates were derived by first calculating the average Medicare allowable costs per discharge during a base year, as adjusted for inflation, for each hospital participating in the Medicare program.  42 U.S.C. § 1395ww(d)(2)(A), (B).  Adjusted averages for each hospital were then "standardized" to remove the effects of factors including indirect medical education costs, wage variations, and "case mix" (that is, the relative complexity and costliness of each hospital's cases).  42 U.S.C. § 1395ww(d)(2)(C).

A hospital's payment under PPS varies in part based on its location.  The statute requires the Secretary to compute a separate average of hospital standardized amounts for rural and urban

4

areas.  42 U.S.C. § 1395ww(d)(2)(D).  In addition, in making payments to particular hospitals,

actual PPS payment rates for each discharge are computed by adjusting the appropriate

standardized amount by a "wage index" to account for area wage differences.  42 U.S.C.

§ 1395ww(d)(2)(H), (3)(E).  The wage index is a comparison of the average hourly wage of the

hospitals in an area with the national hospital average hourly wage.  44 Fed. Reg. 11,612, 11,613

(1979).  Thus, the wage index has a direct impact on the amount of reimbursement a hospital

receives:  the higher the wage index for the area in which the hospital is located, the more

reimbursement the hospital will receive per discharge.  Moreover, under-reported data by any

hospital in the area will have the effect of decreasing payments made to all hospitals in the area,

since the wage index is applied on an area-wide basis.

     The wage index is updated annually based on wage data collected from Worksheet S-3,

Parts III and IV of Medicare cost reports submitted by hospitals.  42 U.S.C. § 1395ww(d)(3)(E);

63 Fed. Reg. 40,954, 40,972 (1998).  The FY 1999 wage index is based on data drawn from

providers' 1995 cost reports.  63 Fed. Reg. at 40,966.  The wage data used to construct the wage

index consists of the total salaries paid to, and the hours worked by, the hospitals' employees and

certain contractors.  Id. at 40,967.  Comparing the salaries paid to the hours worked allows the

Secretary to compute an average hourly wage for each PPS hospital.

     In the Federal Register, the Secretary described in great detail the methodology he used

to construct the area wage indices from the data collected from hospitals' FY 1995 Medicare

cost reports.  Id. at 40,972-73.  First, the Secretary determined the cost of each hospital's total

salaries and fringe benefits as reported on its cost report.  Id. at 40,972.  Next, the Secretary

determined each hospital's total labor hours, that is, the total number of hours worked by the

hospital's employees, also based on data reported on the hospital cost reports.  Id.  The Secretary

then added together the salaries and fringe benefits for all the hospitals within each labor market

area, to arrive at a total figure of salary and fringe benefits for each area.[2/]  Id. at 40,973.  The

Secretary divided the total salaries plus fringe benefits for each area by the sum of the total labor

hours for all hospitals in each area to determine an average hourly wage for the area.  Id.

Finally, the Secretary added the total salaries plus fringe benefits for all hospitals in the nation

and then divided that sum by the national sum of total labor hours to arrive at a national average

hourly wage.  Id.  The Secretary then calculated the wage index value for each urban or rural

labor market area by dividing the area average hourly wage by the national average hourly wage.

Id.

**C.  Wage Data Corrections**

    1.  Annual Wage Data Corrections

    In the very first rulemaking implementing PPS, the Secretary anticipated that occasions

might arise in which the data used to construct the wage index was erroneous.  49 Fed. Reg. 234,

258 (1984).  Accordingly, as he had done in past years, the Secretary in his FY 1999 PPS

rulemaking established a procedure by which hospitals could request correction of their 1995

wage survey data one final time.  63 Fed. Reg. 25,576, 25,589-90 (1998).  Under this procedure,

a hospital making a request for a revision of its calendar year 1995 wage data was required to

submit the proposed revisions, along with complete, detailed supporting documentation, to its

fiscal intermediary by March 9, 1998.  Id. at 25,589.  The fiscal intermediary was to review the

---

[2/] In performing this calculation, "[e]ach hospital was assigned to its appropriate urban or rural
labor market area prior to any reclassifications under sections 1886(d)(8)(B) or 1886(d)(10) of
the [Social Security] Act."  63 Fed. Reg. at 40,973.

proposed revised data, adjust it as appropriate, and transmit any revised data to CMS for use in

calculating the FFY 1999 PPS payment rates on or before April 6, 1998.  Id.  The Secretary

noted that "[t]hese deadlines are necessary to allow sufficient time to review and process the data

so that the final wage index calculation can be completed for development of the final

prospective payment rates to be published by August 1, 1998."  Id.

     If a hospital disagreed with its intermediary's resolution of a requested change, it had one

final opportunity by June 5, 1998, to contact its intermediary and CMS.  Id. at 25,590.  With

respect to the June 5 deadline, CMS noted that "[a]t this time, changes to the hospital wage data

will be made only in those very limited situations involving an error by the intermediary or

HCFA that the hospital could not have known about before its review of the final wage data

file."  Id.

     The Secretary's regulations also address issues concerning the effect of a later reversal of

a decision by CMS or an intermediary to deny a request for a wage data revision.  Thus, the

regulations provide that, "[i]f a judicial decision reverses a CMS denial of a hospital's wage data

revision request," CMS will implement the decision "by applying a revised wage index that

reflects the revised wage data as if CMS's [wage data] decision had been favorable rather than

unfavorable."  42 C.F.R. § 412.63(x)(3); see also 60 Fed. Reg. 45,778, 45,795-96 (1995).

     2.  Mid-Year Wage Data Corrections

     In addition to the opportunities hospitals have to seek corrections to their wage data

before the wage indices are published by August 1 of each year, there is also a procedure

whereby hospitals can seek a mid-year correction.  42 C.F.R. § 412.63(w)(2) (1998) (currently

codified at 42 C.F.R. § 412.63(x)(2) (2006)).  That regulation provides that:

    (2)(i)  HCFA makes a midyear correction to the wage index for an area only if a hospital can show that –
    (A)  The intermediary or HCFA made an error in tabulating the hospital's data; and
    (B)  The hospital could not have known about the error, or did not have the opportunity to correct the error, before the beginning of the Federal fiscal year.

42 C.F.R. § 412.63(w)(2) (1998).

        Mid-year wage index corrections are "effective prospectively from the date the change is made to the wage index."  42 C.F.R. § 412.63(w)(2)(ii) (1998).  This mid-year correction process was available for hospitals' use for the period covered by the FFY 1999 wage indices.  63 Fed. Reg. 25,576, 25,590 (1998); 63 Fed. Reg. 40,954, 40,972 (1998).

        3.  <u>Special One-Time Mid-Year Correction for FFY 1999</u>

        In addition to the standard wage data correction processes, described above, that are available annually, CMS afforded hospitals a "special one-time" mid-year correction process for FFY 1999.  On November 19, 1998, CMS announced that it was providing "hospitals with a limited additional opportunity to request certain revisions to their wage data used to calculate the FY 1999 hospital wage index."  63 Fed. Reg. 64,191 (1998).  In order to qualify for this mid-year correction process, a hospital needed to show that it met one of the following criteria:

    The hospital's data on the May 1998 public use file is recorded as zero on Line 28 of Worksheet S-3, Part II (wage related costs).

    The hospital's data on the May 1998 public use file is recorded as zero in either column 3 or 4 (but not both), with nonzero data in the other column, for Lines 2, 4, 6, or 33 of Worksheet S-3, Part III.

    The hospital properly requested a wage data revision by March 9, 1998, the fiscal intermediary approved a revision (as reflected in a revised Worksheet S-3), but the fiscal intermediary or HCFA made a data entry or tabulation error.

63 Fed. Reg. at 64,192.  As with mid-year corrections pursuant to 42 C.F.R. § 412.63(w)(2),

corrections made pursuant to the special one-time mid-year correction process for FFY 1999 were applied prospectively only.  Id. at 64,191.

### III.  STATEMENT OF FACTS

Plaintiffs are 81 Medicare-participating hospitals subject to the wage index for the Chicago MSA.  Complaint ¶ 9.  Michael Reese Hospital ("MRH"), a non-party to this lawsuit, is also a Medicare-participating hospital located in Chicago, Illinois.  Administrative Record ("A.R.") 238.

### A.  Factual Background

On August 27, 1997, the fiscal intermediary ("FI") sent a letter to MRH stating that it was beginning its desk review of hospitals' wage index data and requesting that MRH provide certain documentation, including its total hours data, by September 22, 1997.  A.R. 140.  MRH did not respond to this inquiry.  A.R. 57; Plaintiffs' Memorandum ("Pls.' Mem.") at 7.[3]  On October 28, 1997, the FI faxed a second request to MRH requesting certain information, including total hours data, by November 3, 1997.  A.R. 153-54.  MRH did not respond to this inquiry either.  A.R. 57; Pls.' Mem. at 7.  On November 6, 1997, the FI notified MRH that it had completed its desk review of MRH's wage data and had made certain adjustments to the wage data.  A.R. 447.  The FI's notice included copies of the amended Worksheet S-3 and an adjustment report that specifically identified the changes to total paid hours.  A.R. 57, 449.  The FI also stated that if MRH disagreed with the amended data, it should notify the FI and provide supporting documentation by November 10, 1997.  A.R. 447.  Once again, MRH did not

---

[3] Plaintiffs' memorandum filed along with its Motion for Summary Judgment contains no title, but is referenced in the docket entries as "Statement of Facts Brief."  We will refer to it here as Plaintiffs' Memorandum or Pls.' Mem.

respond.  A.R. 57.

On March 6, 1998, MRH requested certain revisions to its wage data, including revisions to its "physician fees and hours" and its "contract labor and hours."  A.R. 212-14.  MRH did not request any changes to its total paid hours data that the FI had adjusted on November 6, 1997.  A.R. 212-14.  On March 25, 1998, the FI made further adjustments to MRH's wage data.  A.R. 216-29.  These adjustments included MRH's requested adjustments to contract labor.  A.R. 58, 219.  The FI also stated that if MRH disagreed with the amended data, it should notify the FI and provide supporting documentation by March 31, 1998.  A.R. 216.  The record does not reflect that MRH ever notified the FI that it disagreed with the FI's adjustments.  On July 31, 1998, CMS published the final FFY 1999 wage indices.  63 Fed. Reg. 40,954 (1998) (excerpts at A.R. 504-16).

On November 19, 1998, as described above, CMS published notice in the Federal Register that it was affording hospitals a "Limited Additional Opportunity to Request Certain Hospital Wage Data Revisions for FY 1999."  63 Fed. Reg. 64,191 (1998) (A.R. 518-25).  Hospitals could request revisions to their FY 1995 wage data if they met one of three specific criteria.  Id. at 64,192 (A.R. 520); see supra at 8.  Hospitals that wished to seek a wage data revision needed to submit their requests to CMS by December 3, 1998.  Id. at 64,191 (A.R. 518).  Any revisions to a hospital's wage index stemming from revised wage data would apply "on a prospective basis only."  Id.

On November 30, 1998, pursuant to the November 19, 1998 Federal Register notice, MRH filed a request for a mid-year correction with CMS.  A.R. 527-85.  On December 1, 1998, the Metropolitan Chicago Healthcare Council also wrote to CMS in support of both the mid-year

10

data correction requested by MRH and unrelated requests made by three other hospitals.  A.R. 587-92.  On December 15, 1998, the FI sent a letter to CMS recommending denial of MRH's request for a mid-year correction.  A.R. 597.  The FI stated that "we have determined that the provider does **not** meet the third requirement, which states that the hospital properly requested a wage data revision by March 9, 1998 and that either the fiscal intermediary (FI) or HCFA made a data entry or tabulation error."  A.R. 597 (emphasis in original).

On February 25, 1999, CMS published the final revised average hourly wages and wage indices for each MSA where CMS had accepted revised data.  64 Fed. Reg. 9378 (1999).  CMS received 150 requests from hospitals for wage data revisions of which 101 were granted in full and 7 were granted in part.  Id. at 9379.  These final revised FFY 1999 wage indices did not incorporate the wage data revisions sought by MRH.  A.R. 58; 64 Fed. Reg. 9378.  The revised wage indices were effective beginning March 1, 1999.  Id. at 9385.

## B.  Administrative Proceedings Before the PRRB

On August 23, 1999, a group of hospitals subject to the Chicago MSA wage index filed their request for hearing with the PRRB challenging CMS's determination of the FFY 1999 wage index for the Chicago MSA.  A.R. 1333-37.  Plaintiffs in the instant case and MRH were parties to the group appeal filed with the PRRB.  A.R. 1335-37.  On December 31, 2002, the FI filed a jurisdictional challenge with the PRRB.  A.R. 813-1101.  On December 15, 2005, the PRRB issued a decision dismissing MRH's appeal for lack of jurisdiction.  A.R. 54-63.  However, the PRRB found that it did have "jurisdiction of the claims of the 81 Providers in the Chicago MSA [group appeal] other than Michael Reese."  A.R. 62.

On April 12, 2006, the remaining providers to the PRRB appeal and the FI executed

certain stipulations for the pending PRRB appeal.  A.R. 14-16.  One stipulation stated that "[t]he

parties now agree that the correct count for the total paid hours for Line 1 of Schedule S-3 is

4,350,805."  A.R. 15.  The parties also stipulated that "[w]ith the resolution of the remaining fact

issue that the Board believes it has authority to consider, pursuant to 42 U.S.C. § 1395oo(f)(1)

and 42 C.F.R. § 405.1842, the parties agree that Expedited Judicial Review of this case is

appropriate."  A.R. 15.  Accordingly, by letter dated April 12, 2006, the Plaintiffs here requested

that the PRRB grant EJR.  A.R. 11-12.  The PRRB granted the Plaintiffs' request for EJR on

April 27, 2006.  A.R. 1-10.  Plaintiffs filed the instant lawsuit on June 29, 2006.

## IV.  ARGUMENT

### A.    The Standard of Review is Narrow and the Court Should Grant Broad Deference to the Secretary's Interpretation of his Regulations.

The Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, provides the standard

of review applicable to Plaintiffs' challenge to agency action.  See 5 U.S.C. § 702 (authorizing

suit by "[a] person suffering legal wrong because of action, or adversely affected or aggrieved by

agency action within the meaning of a relevant statute"); see also Steenholdt v. FAA, 314 F.3d

633, 638 (D.C. Cir. 2003).  Chapter 7 of the APA provides that those adversely affected or

aggrieved by agency action may obtain judicial review of a final agency action, except to the

extent that  "(1) statutes preclude judicial review; or (2) agency action is committed to agency

discretion by law." 5 U.S.C. §§ 701(a), 702, 704.  If judicial review is permitted, Chapter 7

authorizes the reviewing court to set aside agency action that is "arbitrary, capricious, an abuse

of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A); see also Citizens

to Preserve Overton Park v. Volpe, 401 U.S. 402, 413-15 (1971); Memorial Hosp./Adair County

Health Ctr., Inc. v. Bowen, 829 F.2d 111, 116-17 (D.C. Cir. 1987).

Although the judiciary bears the responsibility under the APA to set aside agency decisions that meet this description, see MD Pharm., Inc. v. Drug Enforcement Admin., 133 F.3d 8, 16 (D.C. Cir.1998), "[t]he scope of review under the 'arbitrary and capricious standard' is narrow and a court is not to substitute its judgment for that of the agency." Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). Rather, the court's task is to determine whether the agency's decision is "within the bounds of reasoned decision making." Baltimore Gas & Elec. Co. v Natural Resources Defense Council, 462 U.S. 87, 105 (1983). This highly deferential standard presumes the agency action to be valid. See Kisser v. Cisneros, 14 F.3d 615, 619 (D.C. Cir. 1994); see also International Broth. of Teamsters v. United States, 735 F.2d 1525, 1534 (D.C. Cir. 1984). Indeed, in cases similar to the one at hand, the Secretary's interpretation of his rules has been given controlling weight, "unless an alternative reading is compelled by the regulation's plain language or other indications of the Secretary's intent at the time of the regulation's promulgation." Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994) (internal quotation marks and citation omitted); see also Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 94 (1995). Broad deference to the Secretary's interpretation of his own regulations is "all the more warranted when, as here, the regulation concerns 'a complex and highly technical regulatory program.'" Thomas Jefferson, 512 U.S. at 512 (citing Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 697 (1991)).

Accordingly, for all of the reasons set forth below, the Court should give broad deference to the Secretary's interpretation of his regulations in this complex and highly technical case, involving the Medicare "wage index" for Medicare participating hospitals in the Chicago Metropolitan Statistical Area.

13

**B.      The Secretary Correctly Denied MRH's Wage Data Revision Request Under the
Special One-Time Mid-Year Correction Process.**

Under the provisions of the special one-time mid-year correction process, a hospital

could qualify for a correction only under one of three limited criteria set forth by CMS.  63 Fed.

Reg. at 64,192.  MRH requested its revision pursuant to the third criteria, namely, that it had

"properly requested a wage data revision by March 9, 1998, the fiscal intermediary approved a

revision (as reflected in a revised Worksheet S-3), but the fiscal intermediary or HCFA made a

data entry or tabulation error."  Id.; A.R. 527.

Previously, MRH had requested a wage data revision on March 6, 1998, within the

original deadline for revision requests to be effective prior to the beginning of the Federal fiscal

year.  A.R. 212-14.  That revision request pertained to "Part A physician fees and hours [that]

should be included in contract labor and hours."  A.R. 212.  The FI accepted MRH's request and

made certain changes.  A.R. 58, 216-29.  Subsequently, in its November 30, 1998 mid-year

revision request, MRH did not dispute the changes pertaining to its March 6, 1998 request, but

made a new, unrelated request seeking to correct total paid hours.  A.R. 528.  This new error

discovered by MRH had never before been brought to the FI's or CMS's attention.  Therefore,

the FI found that MRH's correction request was not a data entry or tabulation error because

MRH had not requested a revision to this wage data by March 9, 1998 and no error had been

made entering or tabulating the data that MRH had reported.  A.R. 597.

The FI's determination was upheld by the PRRB which found that MRH had "failed to

exhaust its administrative remedies when it did not ask the Intermediary to adjust its total hours

during the initial wage index correction process available to it in November 1997 through March

14

9, 1998." A.R. 59. The PRRB further found that "the change made to total hours was not a data entry or tabulation error that gave rise to the right to seek a mid-year correction." Id. The FI's and PRRB's findings are clearly reasonable and should be upheld. The right to request correction of an error regarding the entering or tabulating of data clearly requires that a prior timely request was made that was then mishandled when being entered or tabulated. At the very least, it was reasonable for the Secretary to construe his November 19, 1998 Federal Register notice as only making a mid-year correction available under the third criterion where such a correction was necessary because of the mishandling of data relating back to a prior correction request. As a result, the PRRB's decision should be affirmed.

Plaintiffs acknowledge that MRH did not bring the error regarding its total hours to the Secretary's attention until November 30, 1998 – well after the standard revisions process closed on March 9, 1998 and the FFY 1999 final PPS rule was published on July 31, 1998. Pls.' Mem. at 11. Nevertheless, Plaintiffs persist in their argument that the Secretary arbitrarily denied the mid-year correction because the hours used were determined in the first instance by the FI.. Pls.' Mem. at 22-23. Plaintiffs fail, however, to explain how this amounts to a "data entry or tabulation error." Rather, the Secretary submits that the hours used by the FI were not erroneous due to a data entry or tabulation error, but rather due to the failure of MRH to provide accurate data as required by the regulations. See 42 C.F.R. § 413.24(f)(4(vi) (Hospital is required to certify that its cost report is true, correct, and complete.). Moreover, MRH's continued failure to advise the FI or CMS of the erroneous data, even after the FI notified MRH on March 25, 1998 of the data it was using and MRH's responsibility to bring any errors to the FI's immediate attention, shifts responsibility to MRH for use of this data.

15

Besides the fact that MRH did not qualify for the special one-time mid-year correction for which it applied, neither MRH nor Plaintiffs in this case availed themselves of the other established mid-year correction process provided by regulation and described in the hospital inpatient PPS proposed rule. <u>See</u> 42 C.F.R. § 412.63(w)(2) (1998); 63 Fed. Reg. at 25,590; <u>see also</u> <u>supra</u> at 7-8. Plaintiffs here could have made a request pursuant to that process and argued that they "could not have known about the error, or did not have the opportunity to correct the error, before the beginning of the Federal fiscal year." 42 C.F.R. § 412.63(w)(2)(i)(B). Although Plaintiffs likely would have faced an uphill struggle to show that they could not have known about the error in MRH's data since that data was made available in February and again in May of 1998, <u>see</u> <u>infra</u> at 21, they chose not to even attempt to do so.[4] Thus, there is no agency determination as to whether MRH or Plaintiffs could not have known about the error that this Court might review.

Had MRH or Plaintiffs made a request under section 412.63(w)(2), the agency would have made a determination as to whether the hospitals "could not have known about the error." However, because Plaintiffs failed to pursue all of their available procedural options and made no request under this provision, they have waived the right to invoke the provision here. <u>See</u> <u>Pleasant Valley Hosp., Inc. v. Shalala</u>, 32 F.3d 67, 70 (4th Cir. 1994) ("As a general matter it is inappropriate for courts reviewing appeals of agency decisions to consider arguments not raised before the administrative agency involved."). The Supreme Court has recognized that "[a]

---

[4] There is no question staff at MRH could have discovered the error. As the Metropolitan Chicago Healthcare Council stated, "In a perfect world, Michael Reese personnel and intermediary personnel would have realized that the final data grossly understated the average hourly amount of Michael Reese Hospital and Medical Center." A.R. 588.

16

reviewing court usurps the agency's function when it sets aside the administrative determination

upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider

the matter, make its ruling, and state the reasons for its action." <u>Unemployment Compensation</u>

<u>Comm. v. Aragon</u>, 329 U.S. 143, 155 (1952).  Thus, having previously failed to avail themselves

of their opportunity to pursue a remedy under section 412.63(w)(2), Plaintiffs should not be

permitted to pursue it now.  Likewise, Plaintiffs should be foreclosed from making any argument

that they could not have known of the error.

C.    **The Secretary's Use of Data Later Found to be Erroneous Does Not Violate the Statute.**

Plaintiffs argue that the Secretary's calculation of the Chicago FFY 1999 wage index

does not comply with the law because CMS "did not accurately measure 'paid hours.'"  Pls.'

Mem. at 19.  However, the Secretary's use of data that is later found to be erroneous does not

amount to a violation of the Medicare statute.

First, it bears repeating here that CMS relies on hospitals to correctly report their data

and gives them numerous opportunities to correct inaccuracies in their data.  During the process

here, that timeframe stretched from the FI's original request for data in August 1997 through

March 1998 – a period of nearly eight months for MRH to work with the FI to identify and

correct errors.  However, except for the one instance in early March when MRH requested a

revision for other data not at issue here, MRH ignored the FI's repeated requests for

documentation and the identification of potential errors.

CMS was first made aware of errors in MRH's data on November 30, 1998 – well after

the wage indices had been finalized on July 31, 1998 and after they went into effect on October

1, 1998.  Thus, the Secretary's refusal to correct the error is fully consistent with his FY 1999

wage data correction policy.  In turn, unless Plaintiffs can show that that policy is unlawful, at least as applied to them, they have no chance of prevailing in this matter.  As demonstrated below, Plaintiffs cannot make this showing.

The Secretary's policy is perfectly consistent with the Medicare statute, because the statute merely requires the Secretary to take into account varying wage levels across the nation and does not set forth a methodology for doing so.  42 U.S.C. § 1395ww(d)(3)(E) contains the statutory mandate that the Secretary adjust the portion of hospital PPS payments attributable to wages and wage-related costs "by a factor (established by the Secretary) reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level."  Apart from requiring that the Secretary update the factor he creates to fulfill this mandate at least once a year after October 1, 1993, section 1395ww(d)(3)(E) leaves the calculation and application of this factor virtually entirely to the Secretary's discretion.  Moreover, this provision clearly does not speak to the questions of whether, or how, wage index errors should be corrected.

Section 1395ww(d)(3)(E) does not even require the Secretary to employ the concept of a "wage index" in adjusting PPS payments for differences in area wage levels.  Rather, it effects a broad delegation of authority to the Secretary to devise a methodology for making that adjustment; the Secretary has done so through the use of the wage index constructed as described in the Federal Register and herein.  Certainly, then, section 1395ww(d)(3)(E) does not speak to such programmatic details as whether or how wage data is to be revised.  Methodist Hosp. of Sacramento v. Shalala, 38 F.3d 1225, 1230 (D.C. Cir. 1994) (Medicare statute "does not specify how the Secretary should construct the [wage] index nor how often she must revise it"; through

18

its silence, Congress "has delegated these decisions to the Secretary."); see also Cullman Reg'l

Med. Ctr. v. Shalala, 945 F. Supp. 287, 295 (D.D.C. 1996) (Hospital conceded that "Congress

has neither specified particular wage data to be included in HCFA wage surveys nor outlined a

process that assures consideration, for reclassification purposes, of properly submitted

corrections to wage data.").

By its terms, section 1395ww(d)(3)(E) merely requires that the Secretary adjust the PPS

payment rate to account for differences in local hospital wages.  That is accomplished by

application of the wage index to the "labor-related portion" of the PPS payment rate.[5/]  Once the

labor-related portion is adjusted to account for wage variations via multiplication by the wage

index, the mandate of section 1395ww(d)(3)(E) is fulfilled.  But that has nothing to do with the

question of what should happen if it is later discovered that the wage index used in carrying out

that statutory mandate is erroneous.  Thus, section 1395ww(d)(3)(E) simply does not speak to

the issue of wage data corrections, and it certainly does not prevent the Secretary from adopting

a policy of not making such corrections at all after the start of a given Federal fiscal year.  See

Methodist Hosp. of Sacramento, 38 F.3d at 1232-33.

In crafting the wage data corrections process, the Secretary carefully weighed competing

---

[5/] The PPS rate consists of separate labor-related and nonlabor-related portions derived from the "hospital market basket," which is "a hospital input price index" that "reflects the average change in the price of goods and services purchased by hospitals to furnish inpatient care."  51 Fed. Reg. 19,985 (1986).  The hospital market basket consists of some "expense categories" that are labor-related (for example, wages and salaries, employee benefits, professional fees, and business services) and other cost categories that are not labor-related (for example, energy, utilities, and malpractice insurance).  51 Fed. Reg. at 19,985-86.  Dividing the PPS rate into separate labor-related and nonlabor-related portions ensures that the federal rate reflects the two main market basket categories of labor-related items and items that are not labor-related, and thereby more accurately accounts for the cost of goods and services purchased by the hospital to provide inpatient services.

considerations of predictability, administrative burden and finality on the one hand, with absolute accuracy on the other.  49 Fed. Reg. 234, 258 (1984).  The D.C. Court of Appeals has in fact held that it is reasonable for the Secretary to value finality over absolute accuracy when deciding what wage data to utilize for purposes of paying Medicare hospitals.  Methodist Hosp. of Sacramento, 38 F.3d at 1232-33.  Thus, the Secretary's use of the data used here, even though it later turned out to be erroneous, does not violate the Medicare statute.

**D.**       **The Wage Data Revision Process is Sufficient to Protect the Rights of Hospitals.**

The Secretary's wage data revision process, which allows hospitals to request revisions to their wage data both prior to the publishing of the annual final rule and also, under more limited circumstances, after the fiscal year has commenced, is sufficient to protect the rights of hospitals.

"Due process is flexible and calls for such procedural protections as the particular situation demands."  Morrissey v. Brewer, 408 U.S. 471, 481 (1972).  The procedural protections the Secretary has put in place in an attempt to ensure the accuracy of the wage data he utilizes in calculating the wage index are more than adequate.  First, the data used to construct the wage index is data submitted by hospitals in the Medicare cost reports.  63 Fed. Reg. at 40,966. Hospitals certify that this information is accurate.  See 42 C.F.R. § 413.24(f)(4)(iv).  Therefore, hospitals have it almost totally in their control to ensure that their wage data is accurate as an initial matter.  See Methodist Hosp. of Sacramento, 38 F.2d at 1234 (Secretary must rely on data submitted by hospitals in constructing the wage index.).

Next, there is a time lag of several years between the hospital's submission of wage data on its cost report and the use of that data in constructing the wage index.  For instance, in this

20

case, the wage data at issue that was used to construct the FFY 1999 wage index was drawn from data derived from providers' 1995 cost reports. 63 Fed. Reg. at 40,996. Therefore, hospitals have several years to ensure that the wage data they have certified on their cost report is accurate, and to seek a revision to that cost report if the data they have initially reported is erroneous.

In addition, beginning early in the calendar year in which the wage index values will be published in the Federal Register, hospitals are given one more opportunity to correct any inaccurate data. Thus, here, the Secretary made each hospital's wage data available to the public in February of 1998, and gave hospitals until March 9, 1998 to request revisions to the data. 63 Fed. Reg. 25,576, 25,589 (1998); 63 Fed. Reg. at 40,971-72. MRH availed itself of this opportunity, asking that certain revisions be made to its wage data, but not asking for revisions to the total paid hours data at issue in this case. A.R. 212-24; see supra at 9. After the initial round of wage data revision requests was processed, another file reflecting each hospital's wage data, revised as necessary, was made publicly available in May 1998, so that hospitals could ensure that data revisions they had been granted had been accurately carried forward. 63 Fed. Reg. at 25,590; 63 Fed. Reg. at 40,971-72. Hospitals had the opportunity to notify the Secretary by June 5, 1998 if there were errors in the data revisions. 63 Fed. Reg. at 25,590; 63 Fed. Reg. at 40,972.

At this point in the process, all timely wage data revisions should have been processed and the wage indices finalized for publication in the Federal Register at the beginning of August 1998 should have been accurate. (Publication for FY 1999 actually occurred on July 31, 1998.) 63 Fed. Reg. 40,954. Even after this point, however, if a hospital discovered an error in its wage data that was the fault of the Secretary, and if the hospital could not have known about the error

21

earlier, the Secretary would revise the wage data at issue.  Id. at 40,972; see also 42 C.F.R. §

412.63(w)(2) (1998).

Thus, the procedural protections surrounding the use of accurate data for purposes of

constructing the wage index are significant.  This Court, per Judge Kessler, has already held that

there is little risk that a hospital that properly takes advantage of these procedural protections

cannot ensure that its wage data used by CMS is accurate, 63 Fed. Reg. at 40,972, and this Court

has so found.  Cullman Reg'l Med. Ctr., 945 F. Supp. at 297.  Given the existence of these

procedures, which are published in the Federal Register for all to see, it is not unreasonable for

the Secretary to refuse to entertain wage data revision requests that fall outside of the parameters

that he has set.

Despite the fact that MRH failed on numerous occasions to respond to the FI's requests

for information applicable to the creation of the wage index, Plaintiffs argue that the FI should

not have made changes to MRH's wage data in November 1997, but rather should have simply

excluded MRH's data from the calculation of the wage index.  Pls.' Mem. at 21.  However, CMS

excludes a hospital's data from the wage index calculations only in two very limited situations.

One situation where CMS has excluded a hospital's wage data is where automated edits of

electronic data indicate that an entry is likely incorrect and corrections cannot be made because

the hospital has terminated its participation in the Medicare program.  71 Fed. Reg. 47,870,

48,015 (2006); see also 59 Fed. Reg. 45,330, 45,353 (1994).  MRH had not terminated its

participation in the Medicare program, thus its wage data cannot be excluded on this ground.

The other situation where CMS has excluded a hospital's wage data is where a hospital had

"incomplete or inaccurate data resulting in zero or negative, or otherwise aberrant, average

22

hourly wages." 71 Fed. Reg. at 48,015. MRH's data did not result in zero or negative average hourly wages, nor was it so aberrant that the FI was unable to use it, thus this situation is also not present here.

Moreover, simply excluding MRH's wage data from the calculation would provide a perverse incentive for hospitals with lower wage costs to refuse to cooperate with the FI and CMS for purposes of the wage index. If a hospital that has below-average wages for its MSA, refuses to assist the FI in its data collections, knowing that the result is that its data will simply be excluded from the calculations, such action would have the effect of raising the wage index for that MSA from what it otherwise would be and consequently increasing Medicare reimbursement to all hospitals in the MSA, including the non-cooperating hospital. Allowing the gaming of the system in this manner should not be allowed.[6/]

E.    **Questions Posed in the Court's Order of March 31, 2008.**

The first question the Court posed in its March 31, 2008 Order was "[w]hether and when Plaintiffs knew or could have known that the total hours data submitted by Michael Reese Hospital (MRH) and subsequently altered by the fiscal intermediary was incorrect? Specifically, did the publication of the data in the public use file in February and May of 1998 give any

---

[6/] Finally, although Plaintiffs intimate that the Secretary is bound by the stipulation entered into by the Plaintiff hospitals and the FI during the PRRB proceedings, the Secretary submits that he is not compelled to accept that stipulation. Howard Young Med. Ctr. v. Shalala, 207 F.3d 437, 443 (7th Cir. 2000) (Secretary not bound by stipulation entered into by hospital counsel and intermediary counsel at PRRB hearing because Secretary not a party to or participant in PRRB hearing). While the Secretary does not dispute the stipulation, in this APA case, the correct number of hours is for the agency to determine – if the Court finds that the Secretary should have granted MRH's wage data correction and remands the matter to the Secretary for further proceedings consistent with such a finding. Of course, the Secretary does not believe that a remand is appropriate in this case.

indication that MRH's data was incorrect?"  As explained more fully below, the answer to this

question is that the public use file did give Plaintiffs the ability to discover the error in MRH's

data in February 1998.

      The record reflects that the hospitals in the Chicago MSA that are Plaintiffs in this action

knew of the error in MRH's data by at least December 1, 1998, the date of a letter sent by the

Metropolitan Chicago Healthcare Council ("MCHC") to CMS in support of MRH's data revision

request.  A.R. 587-92.  The record does not reflect whether the Plaintiff hospitals had actual

knowledge of the error in MRH's data before that date, but the Secretary submits that they could

have obtained such knowledge and thus should have known of the error by February 1998.

Working through local and state hospital associations such as the MCHC, or acting on their own,

hospitals in a labor market area have always had the ability to share data and thus enable

themselves to ensure that both their own data and that of their neighbors is correct.  See, e.g., 58

Fed. Reg. 46,270, 46,295 (Sept. 1, 1993) (noting that CMS would make the data used to

construct the proposed wage index values "available to interested parties upon request" and that

"[h]ospitals concerned about area wide problems are free to communicate with one another to

identify errors.").

      Similarly, in Methodist Hosp. of Sacramento, involving cost years well before the advent

of the public use files, some hospitals in Sacramento, California noticed an error in the wage data

simply by reviewing the published wage index for the affected year and comparing it to the

index for the previous year.  38 F.3d at 1228.  Investigation led to discovery of the error and the

other hospitals persuaded the errant one to request a wage data revision, which was ultimately

granted prospectively.  Id.  If the Plaintiff hospitals here had been similarly vigilant, they might

have been able to take similar action.

The proposed Medicare hospital inpatient PPS rule for FY 1999, published in May 1998, reflected an average hourly wage for MRH (provider number 140075) of $14.13, an average hourly wage for the Chicago MSA of $21.6476, and a wage index for the Chicago MSA of 1.0570.  See 63 Fed. Reg. 25,576, 25,625, 25,638, 25,646 (May 8, 1998).  The final PPS rule for the prior year, FY 1998, published in August 1997, had reflected an average hourly wage for MRH of $20.98, an average hourly wage for the Chicago MSA of $21.8239, and a wage index for the Chicago MSA of 1.0860.  See 62 Fed. Reg. 45,966, 46,057, 46,071, 46,078 (Aug. 29, 1997).  Thus, the proposed FY 1999 values are significantly lower than the final FY 1998 values, especially MRH's average hourly wage, which declined by almost a third.  Certainly that is counterintuitive, as the price of very few things, including labor, goes down so steeply from one year to the next.  Anyone paying attention to these numbers could have realized that there might be an error contained in them, and specifically that the error might involve MRH's data.  The hospitals that became plaintiffs in Methodist Hospital of Sacramento prudently engaged in just this type of analysis and as a result uncovered a mistake that the erring hospital itself had not recognized.  The hospitals that became Plaintiffs in this case, however, did not.  Had they done so, they could have been able to uncover the error in MRH's data by at least May, 1998.

In fact, Plaintiffs could have uncovered the error months earlier than that.  The foregoing discussion of hospitals' significant ability to double-check the accuracy of their neighbors' wage data simply based on the values published in the Federal Register does not even take into account the added tool furnished to them in the form of the public use files CMS issues annually in conjunction with the development of the wage data.  Those files, made available in the spring

25

of each year, originally in the form of a diskette that hospital associations and other interested

parties can obtain from CMS, then later online, contain the raw wage and hour data for every

hospital in the nation.  See 59 Fed. Reg. 27,708, 27,719 (May 27, 1994); 59 Fed. Reg. 45,330,

45, 45350-51 (Sept. 1, 1994); 60 Fed. Reg. 29,202, 29,211 (June 2, 1995); 63 Fed. Reg. at

25,589; 63 Fed. Reg. 40,954, 40,971-72 (July 31, 1998).  The mechanism of the public use file

was specifically designed to give hospitals the maximum opportunity possible to catch errors in

their neighbors' data.  As the Secretary put it, "[t]his not only enabled individual hospitals to

detect errors concerning their own data, but also allowed all hospitals in an MSA or rural area to

check for any obvious discrepancies in the wage index data of other hospitals in their area, as

well as any reduction in the average hourly wage from previous years."  59 Fed. Reg. at 45,350-

51.  Using this data, then, which showed MRH's raw wage and hour data, Plaintiffs could have

discovered the drastic drop in MRH's average hourly wage between FY 1998 and FY 1999 that

was reflected in the published wage index values described above, and they could have done so

in February, 1998, when the FY 1999 public use file was posted online.[7]

The second question the Court posed in its March 31, 2008 Order was "[w]hether there

exists a process by which **Plaintiffs** (not MRH) could have challenged the errors in MRH's data

---

[7]    The actual data reflected in the public use file for MRH for FYs 1998 and 1999 is not
contained in the record, and CMS has been unable to locate it prior to the filing of this
memorandum.  These circumstances reflect the difficulty in addressing for the first time in court
filings factual questions that were not developed at the administrative level.  The Secretary
respectfully submits that, if the Court believes that further factual development is still necessary
even after reviewing the parties' revised memoranda in support of their motions for summary
judgment, the Court should remand the case to the agency for that development.  See Co. of Los
Angeles v. Shalala, 192 F.3d 1005, 1023 (D.C. Cir. 1999) (where the record does not support the
agency action, the proper course of action except in rare circumstances is to remand to the
agency for additional investigation or explanation).

and by when that process could have commenced?" (emphasis in original).  As explained more

fully below, the answer to this question is that while Plaintiffs did not enjoy all the rights to

challenge MRH's data that MRH did, there was one informal and one formal process they could

have utilized to state such a challenge beginning as early as February 1998.

Hospitals that believed there was an error in their wage data after reviewing the February,

1998 public use file could have requested a wage data revision from CMS by March 9, 1998.

Because this opportunity was limited to the situation where a hospital sought to request a

revision to "its" data, 63 Fed. Reg at 25,589, it would not have been available to Plaintiffs to use

to challenge the error in MRH's data.  But this does not mean that Plaintiffs lacked a process to

state such a challenge.  First, if Plaintiffs had diligently reviewed the public use file and

discovered the error in MRH's data as described above, they could have either persuaded MRH

to make a wage data revision request on its own behalf (as in fact MRH did in regard to other

aspects of its data) or they could have informally alerted CMS to the fact that they believed that

MRH's data was flawed.  In the latter scenario, CMS could have in turn alerted MRH and its

fiscal intermediary to the possibility of an error and instructed them to work together to resolve

it.  CMS has done so in the past in similar situations.  In this fashion  Plaintiffs could have

brought the error to MRH's and the agency's attention in February of 1998, leaving more than

adequate time for it to be corrected.

Alternatively, and as noted elsewhere in this memorandum, if Plaintiffs really believed

they had no ability to discover the error in MRH's data prior to December 1, 1998 (when the

MCHC wrote to CMS on MRH's behalf), they could have availed themselves of the process

described at 42 C.F.R. § 412.63(w)(2) (1998) (currently codified at 42 C.F.R. § 412.63(x)(2)).

Using this process, Plaintiffs could have requested that CMS revise MRH's data on the basis that

the error was made by CMS and that the hospitals could not have known about the error, as

Plaintiffs have contended in this action.  The Secretary does not believe Plaintiffs could have

made either showing.  First, while the error may have been partly the intermediary's, it is also

certainly MRH's error for submitting wrong data and not realizing it.  Second, as discussed

above, the Secretary believes the Plaintiff hospitals could have know about the error in February,

1998, well before finalization of the wage index for FY 1999 and the start of that year.

Nevertheless, if, as Plaintiffs contend, they could not have known about the error until

December 1998 or thereabouts, they could have attempted to seek relief under section

412.63(w)(2).  There is no specific time limit for such a request – by its terms the provision

authorizes corrections in appropriate cases at any time in the course of a federal fiscal year, after

the wage index values have been set for that year.  See 42 C.F.R. § 412.63(w)(2)(i) (1998)

("CMS makes a midyear correction to the wage index for an area" if a hospital can show the

government made the error and the hospital could not have known about it or did not have the

opportunity to correct it before the beginning of the fiscal year.)  If it really is true that Plaintiffs

could not have know about the error in MRH's data before the start of the federal fiscal year on

October 1, 1998, they still could have availed themselves of section 412.63(w)(2) as soon as they

did become aware of the error, which had happened by December 1, 1998.  However, Plaintiffs

never did so.

In sum, the Secretary submits that, while hospitals wishing to challenge other hospitals'

data may not have all the rights they have in regard to challenging their own data, they still have

a significant ability to detect errors in other hospitals' data and to correct those errors.  CMS has

28

made the public use files available for just this purpose. The <u>Methodist Hospital of Sacramento</u> and <u>Cullman Regional Medical Center</u> decisions, cited throughout this memorandum, teach that the Secretary must rely on accurate reporting of wage data by individual hospitals, that the process the Secretary has put in place ensures that hospitals have more than adequate opportunity to provide such data, and that a prudent hospital that takes advantage of that process runs little risk that the hospital's data will be reflected inaccurately in the agency's ratemakings. Here neither MRH nor Plaintiffs ever brought the total hours issue to CMS's attention prior to November, 1998, when they tried to rely on the inapplicable one-time wage data correction process to address that error. As a result, MRH could not even perfect an appeal to the PRRB and has acquiesced in that body's unfavorable decision. The Secretary respectfully submits that nothing about his procedures governing hospitals' ability to detect errors in other hospitals' data requires a different result for Plaintiffs.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the Secretary respectfully requests that the Court deny Plaintiffs' motion for summary judgment and grant the Secretary's motion for summary judgment.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR
United States Attorney

                                    _____/s/_____
                                    CHRISTOPHER B. HARWOOD
                                    Assistant United States Attorney
                                    N.Y. Registration No. 4202982
                                    Judiciary Center Building
                                    555 Fourth Street, N.W.
                                    Washington, D.C. 20530
                                    (202) 307-0372


                                    _____/s/_____
                                    ANDREW B. SPALDING
                                    Attorney
                                    D.C. Bar No. 501297
                                    U.S. Department of Health and Human Services
                                    Office of the General Counsel
                                    Centers for Medicare & Medicaid Services Division
                                    5309 Cohen Building
                                    330 Independence Avenue S.W.
                                    Washington, D.C.  20201
                                    (202) 205-8705


OF COUNSEL:

THOMAS R. BARKER
Acting General Counsel

JANICE L. HOFFMAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
for Litigation

United States Department of
Health and Human Services

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ADVENTIST GLENOAKS HOSPITAL, )<br>   et al., )<br> )<br>             Plaintiffs, )<br> )<br>            v. )<br> )<br>MICHAEL O. LEAVITT, Secretary of )<br>   Health and Human Services, )<br> )<br>            Defendant. )<br>                        ) | Civil No. 06-1206 (EGS)<br><br>**ECF** |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE**

Defendant, Michael O. Leavitt, the Secretary of Health and Human Services, submits the following statement of material facts as to which there is no genuine issue in accordance with Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7(h).

1. Plaintiffs are 81 Medicare-participating hospitals subject to the wage index for the Chicago, Illinois Metropolitan Statistical Area ("Chicago MSA"). Complaint ¶ 9.

2. Michael Reese Hospital ("MRH"), a non-party to this lawsuit, is also a Medicare-participating hospital located in Chicago, Illinois. Administrative Record ("A.R.") 238.

3. On August 27, 1997, the fiscal intermediary ("FI") sent a letter to MRH stating that it was beginning its desk review of hospitals' wage index data and requesting that MRH provide certain documentation, including its total hours data, by September 22, 1997. A.R. 140.

4. MRH did not respond to the FI's August 27, 1997 letter. A.R. 57; Plaintiffs' Memorandum ("Pls.' Mem.") at 7.[8/]

---

[8/] Plaintiffs' memorandum filed along with its Motion for Summary Judgment contains no title, but is referenced in the docket entries as "Statement of Facts Brief." We will refer to it here as

5.  On October 28, 1997, the FI faxed a second request to MRH requesting certain information, including total hours data, by November 3, 1997.  A.R. 153-54.

6.  MRH did not respond to the FI's fax of October 28, 1997.  A.R. 57; Pls.' Mem. at 7.

7.  On November 6, 1997, the FI notified MRH that it had completed its desk review of MRH's wage data and had made certain adjustments to the wage data.  A.R. 447.

8.  The FI's November 6, 1997 letter included copies of the amended Worksheet S-3 and an adjustment report that specifically identified the changes to total paid hours.  A.R. 57, 449.

9.  The FI's November 6, 1997 letter stated that if MRH disagreed with the amended data, it should notify the FI and provide supporting documentation by November 10, 1997.  A.R. 447.

10.  MRH did not respond to the FI's November 6, 1997 letter.  A.R. 57.

11.  On March 6, 1998, MRH requested certain revisions to its wage data, including revisions to its "physician fees and hours" and its "contract labor and hours."  A.R. 212-14.

12.  MRH did not request any changes to its total paid hours data that the FI had adjusted on November 6, 1997.  A.R. 212-14.

13.  On March 25, 1998, the FI made further adjustments to MRH's wage data.  A.R. 216-29.

14.  The FI's March 25, 1998 adjustments included MRH's requested adjustments to contract labor.  A.R. 58, 219.

15.  The FI's March 25, 1998 letter stated that if MRH disagreed with the amended data, it should notify the FI and provide supporting documentation by March 31, 1998.  A.R. 216.

---

Plaintiffs' Memorandum or Pls.' Mem.

2

16.  MRH did not respond to the FI's March 31, 1998 letter.

17.  On July 31, 1998, the Centers for Medicare & Medicaid Services ("CMS") published the final Federal fiscal year 1999 wage indices.[9/] 63 Fed. Reg. 40,954 (1998) (excerpts at A.R. 504-16).

18.  On November 19, 1998, CMS published notice in the Federal Register that it was affording hospitals a "Limited Additional Opportunity to Request Certain Hospital Wage Data Revisions for FY 1999." 63 Fed. Reg. 64,191 (1998) (A.R. 518-25).

19.  Pursuant to the November 19, 1998 Federal Register notice, Hospitals could request revisions to their FY 1995 wage data if they met one of three specific criteria. 63 Fed. Reg. 64,191, 64,192 (1998) (A.R. 520).

20.  Hospitals that wished to seek a wage data revision pursuant to the November 19, 1998 Federal Register notice, needed to submit their requests to CMS by December 3, 1998. 63 Fed. Reg. 64,191 (1998) (A.R. 518).

21.  Any revisions to a hospital's wage index stemming from revised wage data submitted pursuant to the November 19, 1998 Federal Register notice, would apply "on a prospective basis only." 63 Fed. Reg. 64,191 (1998) (A.R. 518).

22.  On November 30, 1998, pursuant to the November 19, 1998 Federal Register notice, MRH filed a request for a mid-year correction with CMS. A.R. 527-85.

23.  MRH requested its revision pursuant to the third criteria of the November 19, 1998 Federal Register notice, namely, that it had "properly requested a wage data revision by March 9,

---

[9/] CMS was formerly known as the Health Care Financing Administration ("HCFA"). The agency was renamed CMS in 2001. 66 Fed. Reg. 35,437 (July 5, 2001).

1998, the fiscal intermediary approved a revision (as reflected in a revised Worksheet S-3), but the fiscal intermediary or HCFA made a data entry or tabulation error."  63 Fed. Reg. 64,191, 64,192 (1998); A.R. 527.

24.  On December 1, 1998, the Metropolitan Chicago Healthcare Council also wrote to CMS in support of both the mid-year data correction requested by MRH and unrelated requests made by three other hospitals.  A.R. 587-92.

25.  On December 15, 1998, the FI sent a letter to CMS recommending denial of MRH's request for a mid-year correction.  A.R. 597.

26.  The FI stated that "we have determined that the provider does **not** meet the third requirement, which states that the hospital properly requested a wage data revision by March 9, 1998 and that either the fiscal intermediary (FI) or HCFA made a data entry or tabulation error." A.R. 597 (emphasis in original).

27.  On February 25, 1999, CMS published the final revised average hourly wages and wage indices for each MSA where CMS had accepted revised data.  64 Fed. Reg. 9378 (1999).

28.  CMS received 150 requests from hospitals for wage data revisions of which 101 were granted in full and 7 were granted in part.  64 Fed. Reg. 9378, 9379 (1999).

29.  The final revised Federal fiscal year 1999 wage indices published on February 25, 1999 did not incorporate the wage data revisions sought by MRH.  A.R. 58; 64 Fed. Reg. 9378 (1999).

30.  The revised wage indices published on February 25, 1999 were effective beginning March 1, 1999.  64 Fed. Reg. 9378, 9385 (1999).

31.  On August 23, 1999, a group of hospitals subject to the Chicago MSA wage index

4

filed their request for hearing with the Provider Reimbursement Review Board ("PRRB") challenging CMS's determination of the Federal fiscal year 1999 wage index for the Chicago MSA.  A.R. 1333-37.

32.  Plaintiffs in the instant case and MRH were parties to the group appeal filed with the PRRB on August 23, 1999.  A.R. 1335-37.

33.  On December 31, 2002, the FI filed a jurisdictional challenge with the PRRB.  A.R. 813-1101.

34.  On December 15, 2005, the PRRB issued a decision dismissing MRH's appeal for lack of jurisdiction.  A.R. 54-63.

35.  The PRRB found that it did have "jurisdiction of the claims of the 81 Providers in the Chicago MSA [group appeal] other than Michael Reese."  A.R. 62.

36.  On April 12, 2006, the remaining providers to the PRRB appeal and the FI executed certain stipulations for the pending PRRB appeal.  A.R. 14-16.

37.  The remaining providers and the FI stipulated that "[t]he parties now agree that the correct count for the total paid hours for Line 1 of Schedule S-3 is 4,350,805."  A.R. 15.

38.  The remaining providers and the FI also stipulated that "[w]ith the resolution of the remaining fact issue that the Board believes it has authority to consider, pursuant to 42 U.S.C. § 1395oo(f)(1) and 42 C.F.R. § 405.1842, the parties agree that Expedited Judicial Review of this case is appropriate."  A.R. 15.

39.  By letter dated April 12, 2006, the Plaintiffs here requested that the PRRB grant Expedited Judicial Review ("EJR").  A.R. 11-12.

40.  The PRRB granted the Plaintiffs' request for EJR on April 27, 2006.  A.R. 1-10.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR
United States Attorney


_____/s/_____
CHRISTOPHER B. HARWOOD
Assistant United States Attorney
N.Y. Registration No. 4202982
Judiciary Center Building
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 307-0372


_____/s/_____
ANDREW B. SPALDING
Attorney
D.C. Bar No. 501297
U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
5309 Cohen Building
330 Independence Avenue S.W.
Washington, D.C.  20201
(202) 205-8705

6

<u>OF COUNSEL</u>:

THOMAS R. BARKER
Acting General Counsel

JANICE L. HOFFMAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
for Litigation
United States Department of
Health and Human Services

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ADVENTIST GLENOAKS HOSPITAL,   ) | |
|    et al.,                          ) | |
|                               ) | |
|         Plaintiffs,          ) | |
|                               ) | |
|          v.                    ) | Civil No. 06-1206 (EGS) |
|                               ) | |
| MICHAEL O. LEAVITT, Secretary of   ) | **ECF** |
|    Health and Human Services,      ) | |
|                               ) | |
|         Defendant.         ) | |
| _____) | |

**DEFENDANT'S RESPONSE TO PLAINTIFFS' STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE ISSUE**

Defendant, Michael O. Leavitt, the Secretary of Health and Human Services, hereby responds to Plaintiffs' Statement of Material Facts As To Which There Is No Genuine Issue ("Plaintiffs' Statement") in accordance with Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7(h).

Defendant avers that, to the extent that the parties disagree as to the facts underlying the present action, those disagreements are not material. Instead, all material facts are those found in the record, and under the Medicare statute, 42 U.S.C. § 1395oo(f)(1), and the Administrative Procedure Act, 5 U.S.C. § 706(2), the facts found by the agency are reviewed to determine whether they are unsupported by substantial evidence taken as a whole. Nevertheless, responding specifically to the numbered paragraphs of Plaintiffs' Statement and using the same paragraph numbering, Defendant responds to the following specific assertions in Plaintiffs' Statement:

3. Defendant disputes that the 4,935,791 paid hours had an attending hourly wage of

1

$16.77. The $16.77 was the average hourly wage for the 5,006,981 paid hours that included additional hours for contract labor and home office salaries. A.R. 138.

8. Defendant disputes this statement. The letter does not state nor suggest that it was sent because Michael Reese Hospital's "wage index information reported a more than 10% decrease in its wage index from the year before." A.R. 153. Rather, the hospitals that brought the group appeal suggested that this was the reason. A.R. 145. The Provider Reimbursement Review Board did not make a finding of fact on this, but merely stated that "repeated requests for wage data are <u>alleged</u> to have been made because Reese's average wage changed more than 10% from 1994 to 1995." A.R. 57 (emphasis added).

18. Defendant disputes the accuracy of Plaintiffs' quotation from the Federal Register notice in that it omits the word "Additional." The correct quote from the Federal Register is: "Limited Additional Opportunity to Request Certain Hospital Wage Data Revisions for FY 1999." 63 Fed. Reg. 64,191 (1998) (A.R. 518).

19. Defendant disputes the completeness of Plaintiffs' quotation from the Federal Register notice in that it omits the criterion that the fiscal intermediary must also have approved the wage data revision. A.R. 520.

21. Defendant disputes Plaintiffs' characterization that the fiscal intermediary's adjustment of Michael Reese Hospital's total paid hours was a "data entry or tabulation error." The Provider Reimbursement Review Board found that "the change made to total hours was not a data entry or tabulation error." A.R. 59.

25. Defendant disputes this statement. The Federal Register explains that the public use files contain raw wage and hours data for each hospital nationwide. <u>See</u>, <u>e.g.</u>, 59 Fed. Reg.

27,208, 27,719 (May 27, 1994).

26.  Defendant disputes this statement.  Information contained in the Federal Register was sufficient to allow Plaintiff hospitals to discern that MRH's wage data was in error.  63. Fed. Reg. 25,576, 25,625, 25,638, 25,646 (May 8, 1998).

31.  Defendant disputes this statement.  There is at least one procedure by which a hospital can challenge the accuracy of another hospital's data.  42 C.F.R. § 412.63(w)(2); see also Defendant's Memorandum at 24-29.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR
United States Attorney


_____/s/_____
CHRISTOPHER B. HARWOOD
Assistant United States Attorney
N.Y. Registration No. 4202982
Judiciary Center Building
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 307-0372

3

_____ /s/
ANDREW B. SPALDING
Attorney
D.C. Bar No. 501297
U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
5309 Cohen Building
330 Independence Avenue S.W.
Washington, D.C.  20201
(202) 205-8705

OF COUNSEL:

THOMAS R. BARKER
Acting General Counsel

JANICE L. HOFFMAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
for Litigation

United States Department of
Health and Human Services