UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ADVENTIST GLENOAKS HOSPITAL, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>MICHAEL O. LEAVITT,<br>Secretary, United States<br>Department of Health and Human<br>Services,<br><br>    Defendant. | Case Number 1:06-CV-01206 (EGS) |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND IN REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

### I.    INTRODUCTION

Defendant's brief ignores that the total paid hours reported and used by Defendant in this case were not the total paid hours reported by Michael Reese Hospital (MRH). MRH reported total paid hours of 4,935,791 on the certified cost report it filed and the Defendant's Fiscal Intermediary ("FI") unilaterally changed that figure to 6,491,307. This arbitrary and capricious change was paradoxical considering that the FI was reviewing the figure submitted by MRH because it already appeared too high.

Defendant argues this data entry, which the parties have stipulated was erroneous, was not a data entry error and its erroneous tabulation in the wage index determination at issue was not a tabulation error. The Defendant then asserts that its unilateral entry of wrong information to determine the Chicago MSA FFY 1999 wage index is beyond the authority of this Court to correct.

1

The Defendant notably abandons in this re-briefing his primary argument in the first briefing of this matter that weakly claimed Plaintiff's lacked standing. Plaintiffs presume the Defendant's abandonment of this argument recognizes its lack of merit.[1]

## II. ARGUMENT

### A. The Fiscal Intermediary Made a Data Entry or Tabulation Error and Arbitrarily and Capriciously Refused to Make a Mid-Year Correction to a Wage Index the Defendant Knew Was Incorrect.

The Defendant claims the mid-year correction, for what Defendant concedes was a wrongly calculated wage index, was denied because the FI made no data entry or tabulation error. Defendant's Memorandum, pp. 14-16. Defendant claims the fault for the error lies with MRH's supposed failure "to provide accurate data as required by the regulations." Defendant's Memorandum, p. 15.

The Defendant's position is remarkable considering that it was not MRH which entered the figure of 6,491,307 total paid hours to use when tabulating MRH's average hourly wage to a wrong and deflated figure of $13.81 per hour. Those acts were unilaterally those of the FI and the Defendant.

The Defendant seems to acknowledge that the data at issue was determined and entered by the FI, but claims that Plaintiffs "fail to explain how this amounts to a 'data entry or tabulation error.'" Defendant demands that Plaintiffs state the obvious, but Plaintiffs will oblige. When Defendant unilaterally entered data, of its own choice, that

---

[1] To the extent Defendant attempts to resurrect this argument in its Rebuttal Brief, Plaintiffs refer this court to pp. 2-5 of the original "Plaintiffs' Memorandum In Opposition To Defendant's Motion For Summary Judgment" filed with this court on March 22, 2007.

2

was in error, that constituted a data entry error. When Defendant uses that erroneous data to tabulate an incorrect wage index, that constituted a tabulation error.

The Defendant pleads that the Secretary's restrictive construction for what constitutes a data entry or tabulation error is "reasonable." Defendant's Memorandum at 15. Plaintiffs respectfully suggest that a construction under which no provider in the entire nation qualified is one that is meaningless and not reasonable. See Administrative Record ("A.R.") at 125.

Further, when constructing the wage index, the Defendant has an obligation to use the best data available and at the time of the mid-year correction the Defendant had much better data than it used. "Congress intended the wage index to reflect, as accurately as possible, the most recent survey of wage data available." Anna Jacques Hospital v. Leavitt, 537 F. Supp. 2d 24, 32 (D.D.C. Feb. 26, 2008).

The circumstances here are analogous to Bellevue Hospital Center v. Leavitt, 443 F.3d 163 (2d Cir. 2006), where the United States Court of Appeals rejected a similar claim by the Secretary that once his procedures were followed he no longer had an obligation to gather more data, even though it was clear the initial data gathered was in error. The Court of Appeals noted that "it was arbitrary and capricious for the agency not to return to data gathering" when it had not successfully completed the initial data gathering. Id. at 180. The Court rejected the Agency's claim that the statute only required gathering data every three years and found that was not an excuse for using poor data. The court noted that the statute "does not preclude the agency from doing so more frequently." Id.

The Defendant suggests that had the Metropolitan Chicago Healthcare Council (MCHC) asked for mid-year correction relief for a different reason other than the "data entry or tabulation entry error" criteria that they may have received consideration. Defendant's Memorandum at p. 16.  The Defendant's argument is disturbingly disingenuous because the provision cited requires a tabulation error which Defendant insists never existed.

While the Defendant mentions only a requirement that the party requesting the change "could not have known about the error or did not have opportunity to correct the error," a review of the regulation establishes that the "error" at issue must be a tabulation error of the kind Defendant (wrongly) claims does not exist here.  The relevant regulation at 42 C.F.R. § 412.63(x)(2)(i) reads as follows:

> (x) *Adjusting for different area wage levels*
>
> (1) CMS adjusts the proportion (as estimated by CMS from time to time) of Federal rates for inpatient operating costs computed under paragraph (j) of this section that are attributable to wages and labor-related costs for area differences in hospital wage levels by a factor (established by CMS based on survey data) reflecting the relative level of hospital wages and wage-related costs in the geographic area (that is, urban or rural area as determined under the provisions of paragraph (b) of this section) of the hospital compared to the national average level of hospital wages and wage-related costs. The wage index is updated annually.
>
> (2)
>
>> (i) CMS makes a midyear correction to the wage index for an area only if a hospital can show that --
>>
>>> (A) The intermediary or CMS made an error in tabulating its data; and
>>>
>>> (B) The hospital could not have known about the error, or did not have the opportunity to correct the

4

>> error, before the beginning of the Federal fiscal year.
>
> (ii) A midyear correction to the wage index is effective prospectively from the date the change is made to the wage index.

In his arguments the Defendant referenced and quoted § 412.63(x)(2)(i)(B) without advising this court that said provision was connected to the requirement for a tabulation error in § 412.63(x)(2)(i)(A). Defendant's Memorandum at 16.

The provision Defendant suggests the Plaintiffs should have applied under is actually more restrictive than the one the Defendant claims Plaintiffs applied under. Section 412.63(x)(2) applies only to tabulation errors and contains the additional requirement of the hospital not having opportunity to correct the error. By contrast, the mid-year correction notice in the November 19, 1998 Federal Register included both data entry and tabulation errors as a basis for mid-year correction and did not require that the requesting hospitals not have an opportunity to correct the error.

Nor did the MCHC request for mid-year correction preclude consideration under § 412.63(x)(2)(i). The MCHC request did not limit itself to the exception found in the November 19, 1998 Federal Register. MCHC merely noted that it was under that basis that MRH sought relief. MCHC expressly sought relief based on "the totality of circumstances" while citing the "significant hardship for Chicago area hospitals" if the adjustment were not made. The "totality of the circumstances" producing this "significant hardship" includes that the 81 hospitals in the MSA had no opportunity to know of or correct the error. A.R., pp. 242 – 243. Moreover, the "totality of the

5

circumstances" includes that most of the error was caused by the FI's arbitrary, unilateral entry of the wrong data.

Defendant suggests the Plaintiffs would have had an uphill struggle to show they could not have known about the error because "there is no question staff at MRH could have discovered the error." Defendant's Memorandum, p. 16, note 4. Even assuming that the staff at MRH could have discovered the error, as Defendant has noted, MRH is not a party to this lawsuit. Defendant's Statement of Material Facts as to Which There is No Genuine Issue, ¶ 2. Just because MRH might have been able to discover the error does not mean that any of the Plaintiffs could have. By Defendant's own admission, the notices regarding MRH's specific data were to MRH and not to the Plaintiffs. Id. at ¶¶ 3, and 5 – 8.

Similarly, the Defendant claims that because hospitals certify the accuracy of their cost report data that Plaintiffs are barred from relief for the incorrect wage index determination made by CMS. However, the Plaintiffs in this case certainly never certified the accuracy of MRH's cost report data. In addition, the figure submitted by MRH of 4,935,791 total paid hours is what MRH certified to, and was much more accurate than the 6,491,307 hours used by CMS after the FI unilaterally changed MRH's report of total paid hours to that number.[2]

---

[2] Again, the correct count for total paid hours figure, as stipulated to by the parties, is 4,350,805. A.R., p. 2, ¶ 9.

6

B. **The Law Requires That Wage Indices Reflect Area Differences in Wage Costs Compared to the National Average.**

Declaring that "Section 1395ww(d)(3)(E) does not even require the Secretary to employ the concept of a 'wage index'" the Defendant argues that the use of an erroneous wage index does not violate the statute. Defendant's Memorandum, pp. 18 – 21. The Defendant has to be very selective in his presentation to this Court of the Medicare statute in order to suggest that the concept of a "wage index" is not mandated by Congress. While the words "wage index" are not used in 42 U.S.C. § 1395ww(d)(3)(E), they are used repeatedly in the Medicare statute and Public Laws, often in direct reference to § 1395ww(d)(3)(E).[3] In any event, having created a "wage index" to accommodate the statutory demand for a wage related adjustment factor, the Secretary must implement it to meet the statute's mandate that the wage related adjustment factor reflect "the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level." Id.

Rather than engage in negative arguments about what the statute supposedly does not say, Plaintiffs urge this Court to focus on what the statute does say. It is not really true, as the Defendant asserts, that "apart from requiring that the Secretary update the factor he creates to fulfill this mandate once a year . . . section 1395ww(d)(3)(E) leaves the calculation and application of this factor entirely to the Secretary's discretion." Defendant's Memorandum, p. 18.

---

[3] See e.g. 42 U.S.C. § 1395ww(d)(8)(C) (discussing contingencies related to effects on the "wage index" for hospitals relocated into a different geographic area for PPS payment purposes); § 1395ww(d)(13) providing for an increase in the wage index applied under paragraph (3)(E) for qualifying counties affected by out migration of employees.

7

The statute unambiguously mandates that the adjustment factor (no matter what one calls the wage related adjustment factor) reflect "the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level." §1395ww(d)(3)(E).  The Secretary failed to do that in this instance.  Because the Secretary chose to use erroneous data, and not correct it, the wage level of the Chicago MSA was indisputably incorrect and did not reflect the wage level for the Plaintiff hospitals as compared to the national average hospital wage level.

As pointed out in Plaintiffs' main brief, the Medicare "Act *requires* the Secretary to create an index that *accurately* represents the relative wage levels of hospitals in a given MSA." Centra Health, Inc. v. Shalala, 102 F.Supp.2d 654, 660 (W.D. Va. 2000). "Thus, not only did Congress require a survey of wage-related costs . . . it required that this survey faithfully reflect the actual wage costs of those hospitals in different geographic regions at the time of the survey." Anna Jacques Hospital, 537 F. Supp. 2d at 31. "[T]he plain language of the statute indicates that Congress required the Secretary to conduct an accurate survey of the wages and wage-related costs." Id. "Congress required a survey of actual wage costs . . . so that the survey would accurately 'reflect the relative hospital wage level in the geographic area of the hospital.'" Id. at 33-34.

Accordingly, the Secretary exceeds his authority when he violates "Congress' clear command that he conduct an accurate survey of wages. . . and then update the area wage index on the basis of that survey." Id. at 33.  When the Secretary's approach results in severe distortion of the wage index, then it must be changed to "more accurately reflect the region's hospital wages." Centra Health, 102 F.Supp. at 660. The structure of the

Medicare Act indicates that wage index issues are subject to judicial review and are not protected by agency discretion. Id. at 658. Under the law, judicial review is an appropriate remedy if "the Secretary refused to make any revision to an erroneous wage index." Methodist Hospital of Sacramento v. Shalala, 38 F.3d. 1225, 1230 (D.C. Cir. 1994).

Such an erroneous wage index is exactly what happened in this case, and contrary to the Defendant's claim, the Secretary does not have the discretion to refuse to correct erroneous payments. Congress set forth the appeal and judicial review process in 42 U.S.C. § 1395oo(a) to give hospitals a right to compel corrections to erroneous payments. The Secretary has great discretion to determine how to accomplish adjusting PPS payments to reflect area wage differences as compared to the national average. The Secretary has no discretion to make arbitrary and capricious adjustments that fail to reflect area wage differences as compared to the national average.

### C. The Chicago MSA Wage Index Was Arbitrarily and Capriciously Determined.

The Defendant has little to say regarding the clearly arbitrary and capricious means the wage index was determined in this instance. While Defendant attempts to blame the error on MRH, pointing out that MRH certified its total paid hours on its cost report, Defendant's Memorandum, p. 20, the Defendant virtually ignores that MRH's cost report number was much closer to the correct total paid hours than the number used by Defendant. MRH reported total paid hours of 4,935,791. The Fiscal Intermediary unilaterally changed that number to 6,491,791, a number that neither MRH nor the

9

Plaintiffs in this case "certified." The parties stipulate that the correct number of total paid hours is 4,374,805.

Citing Methodist Hospital of Sacramento, 38 F.3d 1225, the Defendant contends that because hospitals submit their certified accurate cost reports, they therefore "have it almost totally in their control to ensure that their wage data is accurate." Defendant's Memorandum at 21. However, this alleged control is obviously completely lost if the FI chooses to unilaterally change the number reported by the Hospital. In any event, the Plaintiffs in this case had absolutely no control over what either MRH or the FI did in this matter.

The nature of this unilateral change confirms the arbitrary and capricious nature of the determination. The FI investigated MRH's originally reported hours of 4,935,791 because that number seemed much too high. In response to MRH's figure that seemed too high, the FI curiously raised the total paid hours to 6,491,307. Again, the parties stipulate that the correct figure was 4,374,805.

### D. Defendant Arbitrarily and Capriciously Failed to Exclude MRH's Data as Aberrant and Unreliable.

The Defendant acknowledges that the Agency has a policy to exclude data for a hospital with "incomplete or inaccurate data resulting in zero or negative, or otherwise aberrant, average hourly wages." Defendant's Memorandum at 22-23 (*citing* 71 Fed. Reg. at 48,015). Defendant dismissively claims that the data in this case was not so aberrant "that the FI was unable to use it." Defendant's Memorandum, p. 23.

Defendant provides no ascertainable standards as to when data might be so aberrant as to be unusable. The decision in this regard is completely arbitrary. There is no doubt that the data was aberrant and that the FI knew it. The FI investigated the aberration of the total paid hours as being too high. The FI's arbitrary and capricious "solution" was to raise it even more, thereby increasing the aberration. The FI also knew that the data from MRH was incomplete because the FI did not get responses from its inquiries to the hospital.

The FI's decision to use knowingly incomplete data as a basis to increase a number that was already apparently too high was arbitrary and capricious. The FI's appropriate course would have been to make no adjustment at all, or to exclude MRH's data altogether rather than use data that the FI knew, or should have known, was wrong. The Defendant's suggestion that the data was not so aberrant "that the FI was unable to use it," is tantamount to saying that the FI can use data no matter how wrong it is. Doing so will simply produce wrong results, as it did in this case. As this court in Anna Jacques ruled, the Secretary must use data that "as accurately as possible" reflects the most recent data available. 537 F. Supp. at 32. The data originally submitted by MRH was more accurate than the data unilaterally adopted by the FI and it was definitely available at the time the FI made the change from the more accurate data submitted by MRH to less accurate data.

This case is analogous to the decision of the PRRB in JFK-Raritan-Hunterdon 03 Wage Index Group v. BlueCross BlueShield Association, PRRB Hearing Dec. No. 2007-D2, Case No. 03-0482G (Oct. 11, 2006), CCH Medicare and Medicaid Guide, ¶ 81,617.

In <u>JFK</u> two hospitals sought to exclude aberrant wage data submitted by another hospital in their MSA from the wage index determination for the MSA. The hospital with the aberrant data was not a party to the appeal. CMS took the position that the data should be included because the hospital with the aberrant data was in operation for most of the fiscal year at issue.

The PRRB disagreed, noting that it was undisputed that the hospital's cost report contained certain wage data elements that exceeded HCFA's established thresholds and were flagged for resolution by the desk review program. Notably, that is precisely what occurred in the present case. Tr. Vol. I., pp. 57, 142, 145. As in this case, the Board in <u>JFK</u> noted that the aberrant elements could not be resolved. Accordingly, the Board ordered the case "remanded to CMS for the recalculation of the Providers' 2003 wage index excluding South Amboy's wage data, and for the revision of the Providers' program payments affected by the re-calculation." Providers here seek the same relief.

    **E.    Questions Posed in the Court's Order of March, 31, 2008.**

        1.    <u>Providers Could Not Have Been Expected to Know of Michael Reese's Erroneous Wage Index Determination</u>.

The Defendant takes the position that Plaintiff somehow could have gleaned from the "public use file" that the FI unilaterally, and without any kind of notice to the Plaintiffs, altered the Michael Reese wage data. Defendant's Memorandum, pp.23-24. The Defendant thus argues that the Plaintiffs should have accomplished what both the FI and CMS failed to do even though the FI and CMS had far more data and resources. The Plaintiffs did not have the background data from MRH's cost report, nor the notices of the

FI's unilateral adjustments to MRH's cost report submitted data. MRH had that information as did the FI and CMS, but not the Plaintiffs in this case.

There is a certain irony in the Defendant declaring that Plaintiffs could have uncovered the error by May, 1998. Defendant's Memorandum, p. 25. The Defendant argues the Plaintiffs could have uncovered the possible error by noting in the Proposed Rule published on May 8, 1998 that the MRH average hourly wage declined by almost a third. The Defendant even describes this number as "counterintuitive, as the price of very few things, including labor goes down so steeply form one year to the next." Defendant's Memorandum, p. 25. Yet the Defendant, which actually created and entered the number responsible for this, did not notice or act upon this "counterintuitive" aberration.

However, the Plaintiffs in this case did discover exactly what Defendants suggest they should have shortly after May 8, 1998. The Metropolitan Chicago Health Council noticed that the wage index for the Chicago MSA was well off from the prior year and examined the information in the proposed rule. They quickly discovered that MRH's average hourly wage fell in the dramatic manner the government claims should have been noticed.

However, the Plaintiffs did not know why MRH's average hourly wage fell so steeply. As emphasized above, they did not have the background information. The Plaintiffs did not know that the FI had entered a nonsensical number for the total paid hours for MRH and there is no way they could have reasonably known. As the Defendant acknowledges by mid-May of 1998 the "standard revisions process closed on March 9, 1998." Defendant's Memorandum, p. 15.

13

Thus, by the time Defendant's assert Plaintiffs should have known, the Plaintiffs did know at least that there was something wrong (though Plaintiffs did not yet know how it went wrong), but the deadline to request corrections had passed two months earlier.  By the time Plaintiffs discovered there was some sort of problem, the only thing Plaintiffs could do was prevail upon MRH to request a mid-year correction and to join in that request for mid-year correction.  Plaintiffs did exactly that and CMS denied the requested mid-year correction supposedly because the FI's entry of erroneous data, and its use to tabulate the Chicago MSA wage index, was not a data entry or tabulation error.  Defendant's Memorandum, pp. 14-15.

Defendant suggests the Plaintiffs could have gleaned the error from the "public use file" as early as February 1998.  However the unrefined data in the public use file does not contain the calculation of either the Chicago MSA wage index or MRH's average hourly wage that Defendant claims would have put Plaintiffs on notice of a potential problem.  Without background documentation from MRH, Plaintiffs could not know that anything in the unrefined data of the public use file was in error.  The Defendant does not even attempt to explain to this Court how the Plaintiffs could have used this data to find this error when the Defendant himself failed to find the error with access to even more data and background documentation.  In February 1998 any possible effort by Plaintiffs to find this error would have been an expensive and time consuming search for a needle in a very large haystack of data without even the knowledge that a needle was there to be found.  Even then, Plaintiffs would have lacked the background material required to prove, substantiate or even explain the error if it could be found at all.

14

Had Plaintiffs effectively *guessed* that MRH's data *may have been* error the Plaintiffs would have had no proof. It would be as if a taxpayer called the I.R.S. to complain that, based on what she heard about the amount of taxes her neighbor paid, the neighbor paid too little. The taxpayer would do so with no actual proof as to her neighbor's wages, other income and allowable deductions. If the taxpayer's sole argument was that she knew her neighbor paid more tax in the prior year, it is doubtful the I.R.S. would regard that as a basis to declare that the taxpayer's neighbor owes more taxes. Even when presented with proof, CMS in this case refused to make a mid-year correction, hiding behind the false claim that the FI had not made a data entry or tabulation error.

The Defendant suggests the Plaintiffs were not "vigilant" in having the clairvoyance to know that the FI had unilaterally and without notice to any Plaintiff in this case drastically increased the "total paid hours" that so depressed MRH's average hourly wage. That allegation is a more telling commentary on the FI's own lack of vigilance in committing that arbitrary and capricious act to begin with and CMS's own lack of vigilance in failing to take action to correct a near tripling by the FI of MRH's error. Plaintiffs cannot be expected to do with far less data that which the FI and CMS did not do with far more.

      2.    <u>Providers Had No Remedies Other Than Those Pursued</u>.

The Defendant effectively acknowledges that Plaintiffs had no legal remedies to challenge MRH's data by advising this Court that had Plaintiffs found the error the Plaintiffs could attempt to have "persuaded MRH to make a wage data revision request

15

on its own behalf." Defendant's Memorandum, p. 27. This of course simply avoids the Court's actual question which was whether "Plaintiffs (not MRH) could have challenged the errors in MRH's data."

The Court explicitly asked whether Plaintiffs could do something and "not MRH." The Defendant's answer is that the Plaintiffs might have persuaded MRH to do something. Notably, CMS suggests the Plaintiffs could accomplish that which CMS and its FI could not do as they twice requested MRH to provide additional data and MRH did not do so. As discussed above, by the time Plaintiffs had notice of a potential error with MRH's data, the deadline to request revisions had passed two months prior and Plaintiffs could only attempt to persuade MRH to request a mid-year correction. The Plaintiffs did this and the requested correction was denied as CMS perversely asserted that the FI's entry of wrong data was not a data entry error and its use of such wrong data to tabulate the Chicago MSA wage index was not a data tabulation error.

The Defendant then suggests the Providers could have sought relief through regulations currently codified at 42 C.F.R. § 412.63(x)(2). The flaws in that analysis, to include a full quote of that regulation, has already been discussed *supra* pp. 4-5. The cited provision deals with mid-year corrections to a hospital's own data. The Plaintiffs in this case did request a mid-year correction from CMS on December 1, 1998. As the Defendant's memorandum on pp. 10-11 directly acknowledges: "On December 1, 1998, the Metropolitan Chicago Healthcare Council also wrote to CMS in support of . . . the mid-year data correction requested by MRH." That request for a mid-year correction was made under "the totality of the circumstances." Had CMS appropriately granted that

16

request, the Plaintiffs would not be before this Court now requesting the relief that CMS denied. It is more than a stretch for Defendant to argue that Plaintiffs may have received relief from a route they attempted and which Defendant himself denied.

As recently as July 31, 2008, in the internet display copy of the pending Federal Register publication of the Final PPS Rule for FFY 2009, the Defendant again made clear that the provision for making mid-year corrections to the wage index "is not available to a hospital seeking to revise another hospital's data that may be affecting the requesting hospital's wage index for the labor market area." CMS-1390-F, *in* http://www.cms.hhs.gov/AcuteInpatientPPS/downloads/CMS-1390-F.pdf, p. 586. Yet it was precisely that process that the Defendant attempts to tell this Court the Plaintiffs could have employed.

Beyond this, the Defendant incredibly suggests the Plaintiffs could have simply informally notified CMS of the MRH error. This suggestion does not involve a legal challenge and amounts to a claim that Plaintiffs could have simply exercised their First Amendment rights to petition the government. This Court has seen how CMS responded to MCHC's letter requesting correction of the wage index. In any event, such an informal process does not address the Court's request to present a process by which Plaintiffs could challenge MRH's data.

As Plaintiffs' last brief made clear, if a process to challenge MRH's data existed, and if Plaintiffs had administrative remedies they failed to exhaust, then the PRRB's decision to grant expedited judicial review in this case was in error. The PRRB ruled that "there seems to be no formal process that CMS uses" to allow hospitals to correct another

17

hospital's wage data and that "the 81 remaining providers did not have any administrative remedies to exhaust."  A.R., p. 61.

The Defendant acknowledges in his "Statement of Material Facts As to Which There is No Genuine Issue" filed on July 15, 2008 that "the PRRB found that it did have jurisdiction of the claims of the [Plaintiffs in this case],"and at no time does Defendant challenge the accuracy of PRRB's conclusion.  Defendant's Statement, ¶ 35.   Similarly, ¶ 38 of the Defendant's Statement acknowledges that the Defendant's FI stipulated that expedited judicial review in this case was appropriate.  Such a stipulation would not be proper if the Plaintiffs had failed to exhaust administrative remedies available to them.

## CONCLUSION

The FI arbitrarily and capriciously increased the total paid hours for MRH after evaluating why the numbers submitted by the hospital seemed too high.  The number used was a data entry made by the Defendant, not MRH or the Plaintiff hospitals, and it was used to tabulate the FFY 1999 wage index for the Chicago MSA.  This conduct adversely affected every PPS payment made to Plaintiff hospitals.  The Defendant then cemented these errors into place by arbitrarily and capriciously refusing to make a mid-year correction of the wage index that was requested by both MRH and the Plaintiffs.  The Plaintiffs could not have been expected to know of MRH's error, or the FI's aggravation of that error, until at least well after the Defendant's deadline for correcting such errors had passed.  Further, the Plaintiffs had no remedy to correct the error associated with another Hospital's data other than the course pursued by Plaintiffs in this case.

This court should not allow these errors to stand and should grant summary judgment in favor of the Plaintiffs and remand this matter back to the Agency to make corrected payments based on what the parties agree is the correct data, or based on the data excluding the MRH data from the PPS payment determinations.

Respectfully submitted,

LAW OFFICE OF BRAD KELLY, P.C.


s/ Bradley L. Kelly
Bradley Kelly, D.C. Bar No. 292623
7700 Old Georgetown Road
Bethesda, MD 20814
(301) 656-7707
*Attorneys for the Plaintiffs*


OF COUNSEL
HALL, RENDER, KILLIAN, HEATH & LYMAN, P.C.

s/ N. Kent Smith
L. Richard Gohman, Attorney No. 7179-49
N. Kent Smith, Attorney No. 1777-49
Keith D. Barber, Attorney No. 19052-49
Suite 2000, Box 82064, One American Square
Indianapolis, IN 46282
(317) 633-4884
*Attorneys for the Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of August, 2008, a copy of the foregoing was filed electronically. Parties may access this filing through the Court's system.

Christopher Blake Harwood
Christopher.harwood@usdog.gov

Mark D. Polston
Mark.polston@hhs.gov

Paul Edwin Soeffing
Paul.soeffing@hhs.gov

Andrew Brady Spalding
Andrew.spalding@hhs.gov

Jeffrey A. Taylor

                                            s/ Brad Kelly

Law Office of Brad Kelly, P.C.
7700 Old Georgetown Road
Bethesda, MD 20814
(301) 656-7707
*Attorney for Plaintiffs*
734293v1